**MEDIGEN OF KENTUCKY, INC., Medigen of Pennsylvania, Inc., Plaintiffs,**

**v.**

**PUBLIC SERVICE COMMISSION OF WEST VIRGINIA; Boyce Griffith, Chairman; Otis D. Casto, Commissioner; and Richard D. Frum, Commissioner, Defendants,**

**West Virginia Solid Waste Association, Inc., Intervenor.**

**Civ. A. No. 2:90–0761.**

United States District Court, S.D. West Virginia, at Charleston.

Aug. 9, 1991.

---

Mark E. Kauffelt, Charleston, W.Va., for plaintiffs.

Franklin G. Crabtree, Richard E. Hitt, Public Service Com'n of W.Va., Charleston, W.Va., for defendants.

Albert F. Good, Charleston, W.Va., for intervenor.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on plaintiffs' complaint and the stipulations of the parties. Plaintiffs' complaint seeks a permanent injunction and declaratory relief prohibiting defendants from interfering, through the use of criminal warrants or otherwise, with their interstate transportation of medical waste from West Virginia to other states and for a declaration of the rights, duties and obligations of the parties. By order entered on November 1, 1990, the West Virginia Solid Waste Association, Inc., was granted leave to intervene in this action.

### I. *Background*

Plaintiffs are affiliated Delaware corporations engaged in the transportation of medical waste from various customers in West Virginia to disposal facilities in other states. Medigen of Kentucky transports medical waste from West Virginia to a disposal facility in Kentucky. Medigen of Pennsylvania transports medical waste from West Virginia to a waste processing facility in Pennsylvania. After processing, the waste is transported to disposal facilities owned by affiliated corporations in Kentucky and New York. Neither company engages in the intrastate transportation of medical waste from one point in West Virginia to another point in West Virginia.

The individual defendants, Boyce Griffith, Otis D. Casto, and Richard D. Frua, are the current members of the Public Service Commission of West Virginia (hereinafter, PSC). The PSC is a statutory body having jurisdiction over all public utilities in West Virginia. W.Va.Code § 24–2–1 (1991 Cum.Supp.).

After the briefing in this matter was completed, West Virginia enacted a Medical Waste Act, W.Va.Code §§ 20–5J–1 through 20–5J–10 (1991 Cum.Supp.). The parties agree that the merits of this action are to be decided with respect to the specific provisions of that Act and, further, that the Act does not substantively change the position of the parties. The Act provides that effective July 1, 1991, transporters of infectious medical waste shall be regulated by the PSC under the Common Carriers of Motor Vehicles Act, W.Va.Code §§ 24A–2–1 through 24A–2–5 (1986 Repl.Vol. & 1991 Cum.Supp.). The Common Carriers Act requires a prospective common carrier transporter to first obtain a certificate of convenience and necessity from the PSC before commencing operations in the state. § 24A–2–5. Upon application for the certificate, a legal notice of the application is published in the proposed area of operation and existing transporters are given the opportunity to oppose the application. If no protest is made, the certificate may be granted without hearing. If protest is received, the applicant must appear at a hearing and demonstrate that the public convenience and necessity require the proposed service. *Id.* Existing transporters may present contradictory evidence.

In considering the application, the PSC must consider the existing transportation services in the area to be served and if the existing services are "reasonably efficient and adequate," the certificate will not be granted. *Id.* In addition to the required showing of convenience and necessity, applicants must show financial ability, experience and fitness. All contested applications are judged by the same legal standards. Once issued, certificates of conve-

nience and necessity have no expiration date. The PSC has authority to require a certificate holder to provide service to all members of the public within its certificate area. In addition, the PSC regulates other aspects of the transporter's operations, including rates charged to customers. Certificates of convenience and necessity are not required of motor carriers transporting medical waste through the state of West Virginia where points of origin and final disposal are both outside the state.

The Medical Waste Act requires the PSC to provide for "a separate and distinct category of special certificates of convenience and necessity for infectious medical waste" transporters.[1] § 20–5J–10(b). Within the six months following the Act's effective date, the PSC is allowed to grant the special certificates to existing transporters of solid waste holding certificates of convenience and necessity who are currently transporting infectious medical waste and who demonstrate that they are otherwise in compliance with the Act. *Id.* Existing transporters are not required to make any additional demonstration of public convenience and necessity. *Id.* Under the Act, the Department of Health and Human Resources has primary responsibility for the health and safety aspects of medical waste management. § 20–5J–6. Rules and regulations promulgated by the PSC with respect to the transportation of infectious medical waste must not conflict or take precedence over rules promulgated by the Department of Health and Human Resources. § 20–5J–10(a).

Approximately 145 entities presently have authority to transport solid waste in West Virginia, some operating under authority granted as long as forty years ago. The majority of those entities operate exclusively within the state. About thirty-two of those carriers are members of the West Virginia Solid Waste Association, a voluntary association of motor carriers engaged in the transportation of solid waste. Approximately twelve of the Association's members transport medical waste. All members of the Association, and all non-members engaged in the transportation of medical waste, have PSC authority to operate in the state.

Medigen of Kentucky commenced business in West Virginia in December 1989 but neither plaintiff applied for a certificate of convenience and necessity until April 23, 1990, after a competitor filed a complaint with the PSC alleging that plaintiff was operating without PSC authority. Following publication of the required legal notice, the PSC received protests to the application and a hearing on the application was scheduled for August 13, 1990. In the interim, on July 27, 1990, a member of the PSC staff contacted Medigen of Kentucky and advised it to cease transporting medical waste from West Virginia customers until it had obtained the necessary certificate. The staff member also stated that if operations continued without the certificate, the PSC would seek criminal prosecution. In addition, the staff member contacted a customer served by Medigen of Kentucky and told it that Medigen was operating illegally and that an authorized transporter should be used. Upon learning of the conduct of the PSC staff, plaintiffs filed this suit on August 3, 1990, and by agreement of the parties, an order was entered on August 20, 1990, restraining defendants from interfering with plaintiffs' interstate transportation of medical waste from West Virginia to other states pending a final decision on the merits of this action. The hearing before the PSC on plaintiffs' application for a certificate of convenience and necessity was continued and has not been rescheduled.

Defendants do not assert that plaintiffs are transporting medical waste in an unsafe manner and plaintiffs do not claim that state health and safety regulations are not applicable to them. The sole issue before the court is whether defendants can require plaintiffs to obtain a certificate of convenience and necessity prior to transporting medical waste from West Virginia

---

**1.** Under the Act, "medical waste" includes both infectious and noninfectious medical waste, with noninfectious medical waste to be con-
sidered solid waste. § 20–5J–3(6) & (8). The parties agree that plaintiffs transport both infectious and noninfectious medical waste.

to another state for disposal. Plaintiffs contend that requiring a certificate of convenience and necessity is unconstitutional and violates the Commerce Clause of the United States Constitution because it is a direct regulation of interstate commerce and because its purpose is economic protectionism designed to prevent free competition. Plaintiffs also maintain that the requirement violates the Supremacy Clause of the United States Constitution because Congress has preempted the field of market or economic regulation of motor carriers operating in interstate commerce.

## II. *Discussion*

### A. Abstention

■ Defendants, in their brief, seek to have this court abstain from deciding the issues raised in this lawsuit under the abstention doctrine first recognized in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Defendants contend that a decision by this court would be an unwarranted interference with the state's comprehensive regulatory scheme for the management of medical waste. They claim that the issues presented are primarily unsettled questions of state law, best left to decision in the first instance by the state court. In support of their position, defendants assert that plaintiffs' real motive in initiating this action is to obtain federal judicial review of a decision rendered by the PSC in *Bio–Environmental Services, Inc.* In that case, the PSC held that entities currently holding certificates of convenience and necessity for general garbage transportation services could transport medical waste without the necessity of recertification. A motion for reconsideration was filed and remains pending before the PSC on administrative appeal. After disposition of the motion, *de novo* review of the decision may be had in the West Virginia Supreme Court of Appeals. The decision is now substantively codified in the new Medical Waste Act, W.Va.Code § 20–5J–10, and is the portion of the statute under attack here. *See supra*, p. 593.

Abstention under *Burford* is appropriate when action by the federal court would interfere with a "complex regulatory scheme concerning important matters of state policy for which impartial and fair administrative determinations subject to expeditious and adequate judicial review are afforded." *Browning–Ferris, Inc. v. Baltimore Cty. Md.*, 774 F.2d 77, 79 (4th Cir.1985) (quoting *Aluminum Co. v. Utilities Comm'n of N.C.*, 713 F.2d 1024 (4th Cir.1983), *cert. denied*, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984)); *Industrial Maintenance Serv., Inc. v. Moore*, 677 F.Supp. 436, 440 (S.D.W.Va.1987). It may be conceded that the State of West Virginia has an interest in regulating the management of medical waste. In accordance with that interest, the state is in the process of developing a regulatory scheme for the management of medical waste. However, regulations under the portion of the statutory scheme under challenge have not yet been promulgated or adopted. Consequently, a decision by this court will not disturb an existing scheme.

Nor does the statutory provision under challenge require specialized expertise in complex scientific or technical areas with which another tribunal is more familiar. Moreover, contrary to defendants' assertion, the question before the court is not one of state law, much less state law of an unsettled or novel nature, and the court is not undertaking parallel review of a state administrative ruling. Rather, adjudication of the present controversy requires application of long-standing principles evolving from the Commerce Clause of the United States Constitution. The questions raised are particularly federal in nature and are not fairly characterized as the peculiar concerns of state and local governments. The court accordingly concludes that abstention is not warranted.

### B. Preemption

■ The Commerce Clause provides that "Congress shall have Power ... [t]o regulate Commerce ... among the several States." *U.S. Const.* art. I, § 8, cl. 3. The constitutional grant of power gives Congress "pre-emptive authority over the regulation of interstate commerce." *Dennis v. Higgins*, — U.S. —, 111 S.Ct. 865, 870, 112 L.Ed.2d 969 (1991). In other words,

when Congress acts in the area of interstate commerce, the Supremacy Clause [2] guarantees that federal law has priority over conflicting state law. *See id.* 111 S.Ct. at 872. Preemption occurs under the following circumstances:

[W]hen Congress, in enacting a federal statute, expresses a clear intent to preempt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.

*Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986) (citations omitted). "The critical question in any preemption analysis is always whether Congress intended that federal regulation supersede state law." *Id.* at 369, 106 S.Ct. at 1899 (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

The Interstate Commerce Act (ICA) currently provides that the Interstate Commerce Commission (ICC) has "jurisdiction over transportation by motor.carrier ... to the extent that passengers, property, or both, are transported by motor carrier ... between a place in ... a State and a place in another State." 49 U.S.C. § 10521(a)(1)(A) (1991 Repl.Pamph.). Plaintiffs acknowledge that at the present time the ICC has declined to exercise jurisdiction over the interstate transportation of waste, concluding that it is not "property" within the meaning of the ICA. Nonetheless, plaintiffs maintain that Congress, through the ICA, has so entirely occupied the entire field of economic regulation of interstate motor carriage in favor of the competitive forces of the marketplace that the state's

ability to require a certificate of convenience and necessity is impliedly preempted. In support of their position, plaintiffs quote the following portion of *Castle v. Hayes Freight Lines,* 348 U.S. 61, 63, 75 S.Ct. 191, 192, 99 L.Ed. 68 (1954):

Congress in the Motor Carrier Act [now recodified as part of the ICA] adopted a comprehensive plan for regulating the carriage of goods by motor truck in interstate commerce. The federal plan of control was so all-embracing that former power of states over interstate motor carriers was greatly reduced. No power at all was left in states to determine what carriers could or could not operate in interstate commerce.

In *Castle,* the Supreme Court held that Illinois could not punish a motor carrier for repeated violations of state highway regulations by suspending its right to use the state's highways. The carrier held a certificate of convenience and necessity issued by the ICC pursuant to existing statutory authority. *Id.* at 63, 75 S.Ct. at 192–93. The Court concluded that suspension by the state was "the equivalent of a partial suspension of [the carrier's] federally granted certificate" and, consequently, was an impermissible interference with activities authorized by the ICC. *Id.* at 64, 75 S.Ct. at 193.

*Castle* involved state action in direct conflict with the ICC's exercise of express statutory authority. Here, the ICC has decided not to regulate the interstate transportation of waste. Consequently, *Castle* is not persuasive authority for plaintiffs' preemption argument.

Plaintiffs' position is also contrary to the findings of the Supreme Court in *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), where the Court examined the constitutionality of a New Jersey statute prohibiting "the importation of most 'solid or liquid waste which originated or was collected outside the territorial limits of the State.'" *Id.* at 618, 98 S.Ct. at 2532. In examining the preemption argument, the Court concluded

---

**2.** The Supremacy Clause provides that the Constitution and laws of the United States "shall be

the supreme Law of the Land." *U.S. Const.* art. VI.

that the New Jersey law had not been preempted by federal legislation. *Id.* at 620, 98 S.Ct. at 2533. The Court noted:

> From our review of this federal legislation [the Solid Waste Disposal Act], we find no "clear and manifest purpose of Congress" to pre-empt the entire field of interstate waste management or transportation, either by express statutory command, or by implicit legislative design. To the contrary, Congress expressly has provided that "the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies." Similarly, [New Jersey's law] is not preempted because of a square conflict with particular provisions of federal law or because of general incompatibility with basic federal objectives. In short, we agree with the New Jersey Supreme Court that [the statute] can be enforced consistently with the program goals and the respective federal-state roles intended by Congress when it enacted the federal legislation.

*Id.* at 620–21 n. 4, 98 S.Ct. at 2533–34 n. 4 (citations omitted).

■ Plaintiffs point to no federal legislation subsequent to *Philadelphia* which would alter the Supreme Court's conclusion that state laws governing the interstate transportation of solid waste are not preempted by federal legislation.[3] The court accordingly finds that the statute and regulations at issue here are not preempted by federal law and cannot be invalidated on that ground.

### C. Implications of the Dormant Commerce Clause

■ In addition to granting Congress preemptive authority over the regulation of interstate commerce, the Commerce Clause confers "a 'right' to engage in interstate trade free from restrictive state regulation." *Dennis v. Higgins,* —— U.S. ——, 111 S.Ct. 865, 871, 112 L.Ed.2d 969 (1991). Consequently, the Commerce Clause "also limits the power of the States to erect barriers against interstate trade." [4] *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). States are not totally prohibited from acting in a manner that restricts interstate commerce, however. *Id.* at 36, 100 S.Ct. at 2015. In the absence of federal action, "the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected," *id.,* so long as they "act in a manner consistent with the 'ultimate ... principle that one state in its dealings with another may not place itself in a position of economic isolation,'" *id.* (quoting *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 527, 55 S.Ct. 497, 502, 79 L.Ed. 1032 (1935)).

### 1. Standard of Review

■ Two analytical approaches are employed in determining whether state regulation exceeds the bounds permitted under the dormant powers of the Commerce Clause. *Brown–Forman Distillers v. New York Liquor Auth.,* 476 U.S. 573, 578–79, 106 S.Ct. 2080, 2083–84, 90 L.Ed.2d 552 (1986). "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor instate economic interests over out-of-state interests," the statute is generally considered *per se* invalid and stricken down without further inquiry. *Id.* at 579, 106 S.Ct. at 2084. On the other hand, "a statute [which] has only indirect effects on interstate commerce and regulates evenhandedly" is examined with respect to "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits."

---

**3.** The court notes that since the Supreme Court's decision in *Philadelphia,* a demonstration medical waste tracking program has been authorized by Congress. 42 U.S.C. § 6992 (1991 Supp. Pamph.). However, West Virginia is not a participating state and its provisions are not applicable here.

**4.** The inherently restrictive powers of the Commerce Clause, which operate even when Congress abstains, are referred to by legal scholars as the negative implications of the dormant Commerce Clause. 1 R. Rotunda, J. Nowak, & J. Young, *Treatise on Constitutional Law: Substance & Procedure* § 11.1 (1986).

*Id.* (citing *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 141, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)). No clear line separates the category of state legislation that is virtually *per se* invalid from the category requiring a balancing approach. *Id.* "In either situation, the critical consideration is the overall effect of the statute on both local and interstate activity." *Id.*

Plaintiffs contend that the state statute at issue here is *per se* invalid because it is a direct regulation of interstate commerce and because its purpose and effect is economic protectionism. In support of their direct regulation argument, plaintiffs cite a series of cases holding that states cannot require interstate carriers to obtain certificates of convenience and necessity before operating solely in interstate commerce. The principal cases relied upon by plaintiffs are *Buck v. Kuykendall,* 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623 (1925) and *George W. Bush & Sons v. Maloy,* 267 U.S. 317, 45 S.Ct. 326, 69 L.Ed. 627 (1925), both decided on the same day.

In *Buck,* plaintiff, having obtained the necessary license from the State of Oregon, sought a certificate of public convenience and necessity from the State of Washington for the operation of an "auto stage line" carrying passengers exclusively between Portland and Seattle. A portion of the highway to be traveled in Washington was built with the assistance of federal aid. Washington denied the certificate on the ground that adequate transportation was already being provided by existing certificate holders. Washington argued that it was within the State's police power to "promote good service by excluding unnecessary competing carriers." *Buck,* 267 U.S. at 315, 45 S.Ct. at 325–26.

While recognizing that the Commerce Clause allows state regulations adopted to promote safety and conservation of its highways, the Supreme Court rejected Washington's argument that the certificate of convenience and necessity was an indirect and reasonable burden on interstate commerce. *Id.* In striking down the requirement of the certificate, the Court stated:

[The statute's] primary purpose is not regulation with a view to safety or to conservation of the highways, but the prohibition of competition. It determines not the manner of use, but the persons by whom the highways may be used. It prohibits such use to some persons while permitting it to others for the same purpose and in the same manner. Moreover, it determines whether the prohibition shall be applied by resort, through state officials, to a test which is peculiarly within the province of federal action—the existence of adequate facilities for conducting interstate commerce. The vice of the legislation is dramatically exposed by the fact that the State of Oregon had issued its certificate which may be deemed equivalent to a legislative declaration that, despite existing facilities, public convenience and necessity required the establishment by Buck of the auto stage line between Seattle and Portland. Thus, the provision of the Washington statute is a regulation, not of the use of its own highways, but of interstate commerce. Its effect upon such commerce is not merely to burden but to obstruct it. Such state action is forbidden by the Commerce Clause. It also defeats the purpose of Congress expressed in the legislation giving federal aid for the construction of interstate highways.

*Id.* at 315–16, 45 S.Ct. at 326.

In *Bush,* the Court was faced with a similar state requirement. The State of Maryland prohibited motor vehicle freight transporters from using its highways without first obtaining permission from the state, which permission could be refused on a finding that the permit was "prejudicial to the welfare and convenience of the public." *Bush,* 267 U.S. at 323, 45 S.Ct. at 327 (quoting Laws of Maryland). *Bush,* which operated exclusively in interstate commerce, was denied permission to use Maryland's highways. Noting that the use of federal aid was not involved, the Court nonetheless found Maryland's statute unconstitutional because it conflicted with the "clear purpose of Congress [in the federal aid legislation] that state highways shall be

598

open to interstate commerce," and because the statute "invaded a field reserved by the Commerce Clause for federal regulation." *Id.* at 324–25, 45 S.Ct. at 327.

■ Both before and after *Buck* and *Bush,* it has been consistently held that a state may not require a certificate of convenience and necessity from a carrier engaged exclusively in interstate commerce before it can operate within the state's borders. *E.g., Sprout v. South Bend,* 277 U.S. 163, 171, 48 S.Ct. 502, 504–05, 72 L.Ed. 833 (1928) ("The privilege of engaging in [interstate] commerce is one which a state cannot deny"); *Interstate Busses Corp. v. Holyoke St. Ry. Co.,* 273 U.S. 45, 51, 47 S.Ct. 298, 299–300, 71 L.Ed. 530 (1927) ("No ... certificate of public convenience and necessity is required in respect of transportation that is exclusively interstate"); *Barnett v. New York,* 232 U.S. 14, 31, 34 S.Ct. 203, 207, 58 L.Ed. 483 (1914) ("Local police regulations cannot go so far as to deny the right to engage in interstate commerce, or to treat it as a local privilege, and prohibit its exercise in the absence of a local license"); *Blease v. Safety Transit Co.,* 50 F.2d 852, 855 (4th Cir.1931) (the question of a state's ability to require a certificate of convenience and necessity as a condition of operating in interstate commerce "has been so repeatedly answered in the negative as not to justify further discussion"); *Gulf Coast Motor Freight Lines v. United States,* 35 F.Supp. 136, 137 (S.D.Tex.1940) ("it is beyond the constitutional power of the state commission to permit or prohibit carriage interstate on grounds of public convenience and necessity"); *United States v. Union Pacific R.R. Co.,* 20 F.Supp. 665, 667 (D.C.Idaho 1937) ("the state board has no authority to grant certificates of public convenience and necessity to those engaged in interstate commerce operations"); *Atlantic–Pacific Stages v. Stahl,* 36 F.2d 260, 262 (W.D.Mo.1929) ("[w]here a carrier is engaged exclusively in interstate commerce a state may not require it to obtain a certificate of convenience and necessity"); *Hi–Ball Transit Co. v. Railroad Comm'n of Tex.,* 27 F.2d 425 (N.D.Tex.1928) (state requirement that commission consider quality of service, financial ability of applicant and adequacy of existing service before granting a certificate "is entirely unconstitutional, when sought to be applied to interstate commerce"); *Magnuson v. Kelly,* 35 F.2d 867, 869 (E.D.Ky.1927) (the requirement of a certificate of convenience and necessity "is in violation of the provisions of the federal Constitution conferring on Congress power to regulate interstate commerce. The state has no power absolutely or conditionally to deny [an interstate motor] carrier the rights to use its public highways"); *Interstate Busses Corp. v. Blodgett,* 19 F.2d 256, 258 (D.Conn.1927), *aff'd,* 276 U.S. 245, 48 S.Ct. 230, 72 L.Ed. 551 (1928) (the state "may not enact a statute which requires an interstate carrier of passengers by motor bus to secure a certificate ... to establish the public convenience and necessity requiring the operations of busses"); *Red Ball Transit Co. v. Marshall,* 8 F.2d 635, 639 (S.D.Ohio 1925) ("a state law which permits denial of a certificate of public convenience and necessity to a common carrier of passengers and express, purely in interstate commerce, is unconstitutional"); *Miller Transp. v. Alabama Pub. Serv. Comm'n,* 454 So.2d 1373 (Ala.1984) (upholding PSC decision that a certificate of public convenience and necessity was not required for interstate barge transportation of bulk commodity); *Port of Seattle v. Washington Utilities & Transp. Comm'n,* 92 Wash.2d 789, 597 P.2d 383, 390 (1979) ("state's certification requirements for carriers cannot be applied to a common carrier in exclusively interstate commerce"); *see Lloyd A. Fry Roofing Co. v. Wood,* 344 U.S. 157, 73 S.Ct. 204, 97 L.Ed. 168 (1952) (state permitted to require certificate of convenience and necessity when only purpose was for registration of those using its highways and where state disclaimed any other authority over carriers operating solely in interstate commerce).

Defendants and intervenor assert that *Buck* and *Bush* and their progeny are not

dispositive of this case.[5] They contend that *Buck* is really a preemption case, pointing to the Supreme Court's comment that the question of whether adequate facilities for conducting interstate commerce exists is "peculiarly within the province of federal action." *See Buck,* 267 U.S. at 316, 45 S.Ct. at 326, *quoted supra,* p. 597. Inasmuch as Congress has declined to regulate solid waste, including medical waste, they argue that the state is free to regulate who may operate in the field.

The court does not read *Buck* and *Bush* so narrowly. The Supreme Court's holding in *Buck* does not rest upon the federal government's express exercise of authority to regulate who may use. highways but rather on the inherently restrictive powers of the Commerce Clause itself. A state statute which does not regulate "the manner of use, but the persons by whom the highways may be used ... is forbidden by the Commerce Clause." *Id.* The Supreme Court continues to enunciate the principle that even in the absence of federal action, a state is generally prohibited by the Commerce Clause itself from directly regulating interstate commerce. *Edgar v. Mite Corp.,* 457 U.S. 624, 640, 102 S.Ct. 2629, 2639–40, 73 L.Ed.2d 269 (1982) ("The Commerce Clause, however, permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited") (citing *Shafer v. Farmers' Grain Co.,* 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925)); *Brown–Forman,* 476

U.S. at 579, 106 S.Ct. at 2084 ("When a state statute directly regulates or discriminates against interstate commerce or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry"); *see also Dennis,* 111 S.Ct. at 871 (the Commerce Clause confers a " 'right' to engage in interstate trade free from restrictive state regulation").

*Brown–Forman* indicates that state statutes which directly regulate interstate commerce or discriminate against interstate commerce are generally invalid *per se.* However, in another Commerce Clause case, *Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), decided the same month as *Brown–Forman,* the Supreme Court, faced with a state statute that facially discriminated against interstate trade, nonetheless rejected application of a *per se* rule of invalidity and found it proper to analyze the constitutionality of the statute with respect to its burden on interstate commerce. Maine had a statute which banned the importation of live baitfish, and thus restricted "interstate trade in the most direct manner possible." *Id.* 477 U.S. at 137, 106 S.Ct. at 2447. However, the Court went on to say: "[T]his fact alone does not render the law unconstitutional." *Id.* at 138, 106 S.Ct. at 2447.

Following earlier decisions, the Court distinguished between state statutes that "burden interstate transactions only incidentally, and those that affirmatively dis-

5. Citation is also made to the Supreme Court's decision in *Panhandle Co. v. Michigan Pub. Serv. Comm'n,* 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951), where a contrary result was reached. Panhandle transported natural gas by interstate pipe line into the State of Michigan where it supplied gas to Michigan Consolidated Gas Company, a public utility. Consolidated provided gas to large industrial manufacturers in the Detroit area, including Ford Motor Company, with Panhandle being the exclusive source of the gas supply. Panhandle then contracted to sell directly to Ford, proposing to install a tap line substantially parallel to the one already in use by Consolidated through the streets and alleys of Detroit. Consolidated filed a complaint with the Michigan PSC, which held that Panhandle must first obtain a certificate of convenience and necessity. *Id.* at 331, 71 S.Ct. at 778–79. The Commission's order was upheld by

the Michigan Supreme Court. The United States Supreme Court affirmed the PSC's authority to require the certificate.

Critical to the decision of the United States Supreme Court was the finding that the certification requirement was not an absolute prohibition against Panhandle's sale of gas in the Detroit market. *Id.* at 336, 71 S.Ct. at 781. Rather, the certification requirement served only to regulate the manner in which Panhandle could sell gas to customers such as Ford by requiring that the sales be made through Consolidated. *Id.* Inasmuch as Panhandle was not prohibited from all sales in the area, it could be required to obtain the certificate of convenience and necessity before engaging in direct sales. *Id.* at 336–37, 71 S.Ct. at 781. *Panhandle* is thus distinguishable from those cases in which the certification requirement has the effect of denying access to the market.

criminate against such transactions." *Id.* Statutes which burden interstate commerce only incidentally are analyzed under the standard enunciated in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), and found invalid "only if the burdens they impose on interstate trade are 'clearly excessive in relation to the putative local benefits.'" *Id.* On the other hand, when a state statute discriminates "against interstate commerce 'either on its face or in practical effect,' the burden falls on the State to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Id.* (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979)). Finding that "Maine's import ban discriminates on its face against interstate trade," the Court subjected it to the stricter level of scrutiny outlined in *Hughes* and upheld the statute on the finding that "Maine's ban on the importation of live baitfish serves legitimate local purposes [of protecting the state's wild fish population from baitfish parasites and non-native fish species] that could not adequately be served by available nondiscriminatory alternatives." *Id.* 477 U.S. at 151, 106 S.Ct. at 2454.

■ In the instant case, the court concludes that the defendants' requirement of a certificate of convenience and necessity as a condition of allowing plaintiffs to operate in interstate commerce is a direct rather than an incidental burden on interstate commerce.[6] Inasmuch as the Court in *Maine* found it appropriate to inquire into the state's purpose in enacting a statute that discriminated against interstate commerce on its face and the feasibility of nondiscriminatory solutions, this court concludes that similar inquiry should be made here into defendants' direct regulation of interstate commerce through the requirement of a certificate of convenience and necessity. The validity of the requirement can be upheld only if the State meets its burden of showing both that the requirement of the certificate "serves a legitimate local purpose" and that no other means can adequately serve that purpose.[7]

### 2. Balancing of Interests

Defendants contend that the requirement of a certificate of convenience and necessity advances the state's legitimate interest in protecting the safety and health of its citizenry by insuring "the statewide availability of medical waste collection and transportation service."[8] Defendant's Memorandum, p. 30. According to defendants, the state's regulatory scheme accomplishes this goal because a certificate holder who refuses to serve all points in the certificate area runs the risk that a competitor will be granted overlapping authority. *Id.* at 34. Moreover, a certificate holder can be compelled to provide service and the PSC can intervene in rate disputes. *Id.* at 34–35. In defendants' view, without the certification requirement, medical waste generators would be subject to "market whim" and potentially "ruinous competition" from those who would "mo-

**6.** The claim of the defendants and the intervenor that the statutory requirement of a certificate of convenience and necessity only incidentally burdens commerce and should be evaluated under the less demanding standard of *Pike v. Bruce Church* is, accordingly, rejected.

**7.** Having concluded that the statutory requirement of a certificate of convenience and necessity, although a direct regulation of interstate commerce generally subject to a rule of *per se* invalidity, nonetheless requires further inquiry, the court finds it unnecessary to address plaintiffs' alternative argument that the requirement is *per se* invalid because it is an impermissible form of economic protectionism. Although the incidental effect of serving a legitimate local purpose may be some degree of economic protectionism, the state is entitled, in light of the Supreme Court's approach in *Maine,* to have its statute considered under the strict scrutiny doctrine.

**8.** Defendants also list other interests protected by their existing statutory scheme. For example, they mention the need to regulate the safe transportation of medical waste. Plaintiffs do not dispute the authority of the state to regulate in the areas of safety and health, being traditionally of local concern. Accordingly, those aspects of the regulatory scheme are not in issue.

nopolize the market for the purpose of dictating price and service." *Id.* at 34.

Intervenor is concerned that noncertificate holder transporters would serve only the most profitable customers, leaving members engaged solely in intrastate transportation to serve the unprofitable customers because they can be compelled to do so by the PSC. Intervenor further contends that if plaintiffs are successful in obtaining the right to provide medical waste transportation services without obtaining certification, others will also enter the market, thereby creating chaos in the state's comprehensive regulatory scheme for the management of medical waste. Defendants and intervenor both maintain that without the ability to require service to all generators of medical waste, rural hard-to-serve generators will be without service because service to them would not be profitable. Controlled competition, they contend, is the only means by which adequate medical waste transportation services can be guaranteed to all. Thus, they argue, conditioning certification upon a showing of convenience and necessity, while having an incidental effect on interstate commerce, nonetheless serves the legitimate purpose of insuring state-wide availability of medical waste transportation.

 Defendants and intervenor also contend, mistakenly, that the burden is on plaintiffs to offer an alternative that would be less burdensome on interstate commerce and that plaintiffs have failed to show a less restrictive means of accomplishing the state's legitimate goal of insuring adequate service to all generators of medical waste. Plaintiffs have met their burden of showing that the certification requirement is a direct regulation of interstate commerce, generally prohibited by the Commerce Clause. The burden accordingly shifts to the defendants to show both that the requirement " 'serves a legitimate local purpose' " and that this purpose cannot be served by a means less burdensome on interstate commerce. *See Maine,* 477 U.S. at 138, 106 S.Ct. at 2447.

 Defendants and intervenor maintain that the legitimate state purpose served by the certification requirement is the provision of adequate medical waste transportation to all. Yet, it is obvious that requiring a showing of necessity for additional services has the strong anticompetitive purpose and effect of restricting market entry. The argument that a state may serve the admittedly legitimate purpose of protecting the health, safety and welfare of its citizens by suppressing competition has been soundly rejected as being contrary to a basic tenant underlying the Commerce Clause: "[E]very consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any." *H.P. Hood & Sons v. DuMond,* 336 U.S. 525, 538–39, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949). Moreover, it may be, as plaintiffs suggest, that experience elsewhere demonstrates that adequate state-wide medical waste transportation service can be provided without restricting competition.

On the record before the court, defendants have failed to make the requisite showing that the certification requirement serves a legitimate state purpose and that the purpose cannot be accomplished without restricting competition. The court recognizes, however, that the parties did not foresee the court's determination that the level of scrutiny appropriate for analyzing the requirement at issue necessitates a showing that there is no less burdensome means of accomplishing a legitimate goal. The court accordingly deems it proper to provide defendants with an opportunity to meet that burden.

### III. *Conclusion*

Having determined, for the reasons stated, that it is appropriate to provide the parties with an opportunity to present further evidence to the court, it is ORDERED that the parties proceed in accordance with the scheduling order entered contemporaneously herewith.