MEDIGEN OF KENTUCKY, INC.,
Medigen of Pennsylvania,
Inc., Plaintiffs,

v.

PUBLIC SERVICE COMMISSION OF
WEST VIRGINIA; Boyce Griffith,
Chairman; Otis D. Casto, Commission-
er; and Richard D. Frum, Commission-
er, Defendants,

and

West Virginia Solid Waste Association,
Inc., Intervenor.

Civ. A. No. 2:90–0761.

United States District Court,
S.D. West Virginia,
at Charleston.

Jan. 22, 1992.

Mark E. Kauffelt, Charleston, W.Va., for plaintiffs.

Franklin G. Crabtree, Richard E. Hitt, Public Service Com'n of W.Va., Charleston, W.Va., for defendants.

Albert F. Good, Charleston, W.Va., for intervenor.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on the plaintiffs' amended complaint for a permanent injunction, declaratory relief and attorneys' fees.

Reference is made to the memorandum order entered in this action on August 9, 1991, 787 F.Supp. 590 for the background giving rise to this dispute.[1] In that order, the court determined that the defendants have the burden of showing that the requirement of a certificate of convenience and necessity from the Public Service Commission (hereinafter, PSC) prior to engaging in the interstate motor carrier transportation of medical waste serves a legitimate state purpose and that the demonstrated purpose cannot be served by a means less burdensome on interstate commerce. The matter then came on for hearing on October 23, 24, and 28, 1991.[2]

### I. *Commerce Clause Claim*

At the hearing, the defendants introduced into evidence a copy of the policy statement submitted to the West Virginia legislature by the Medical Waste Subcommittee of the Joint Committee on Government and Finance. In large part, the policy statement is incorporated into section 20–5J–2 of the West Virginia Medical Waste Act, W.Va.Code §§ 20–5J–1 through 20–5J–10 (1991), which sets forth the legislative findings and purpose. Both declare that "effective controls for the management of medical waste are necessary to ensure the protection of the public health, safety and welfare, and the environment." With respect to transportation, both the policy statement and section 20–5J–2 state that "transportation [of medical waste] in the infectious state, pose[s] a potentially serious threat to the health, safety and welfare of West Virginians" and "that the necessity for transporting infectious medical waste be minimized, and that any infectious medical waste transported be safely packaged and identified by source and content." § 20–5J–2. The legislature thus determined "to regulate and control the generation, handling, storage, transportation, treatment and disposal of infectious and noninfectious medical waste." *Id.*

■ As part of the overall statutory scheme, the Act provides that motor vehicle common carriers engaged in the collection, hauling and transportation of infectious medical waste must obtain certificates of convenience and necessity from the PSC. § 20–5J–10. However, the legislative findings and purpose on which the Act is based do not state how the certification requirement protects the public health, safety and welfare.[3] Nonetheless, the defendants and intervenor argue that certification serves the important state purpose of insuring the state-wide availability of medical waste collection and transportation services at reasonable rates. Presumably, the likelihood that medical waste genera-

1. Plaintiffs have since been given leave to file the amended complaint adding a second count under which they allege that the defendants' conduct is actionable under the Civil Rights Act, 42 U.S.C. § 1983, in that the Public Service Commission's requirement of a certificate of convenience and necessity constitutes a deprivation, under color of state law, of a right secured to the plaintiffs under the Commerce Clause of the United States Constitution. Plaintiffs thus contend that if they prevail on the § 1983 claim, they are entitled to reasonable attorneys' fees under § 1988 of the Civil Rights Act.

2. The parties have agreed that this case be submitted for final resolution based on the evidence adduced at the hearing, the parties' pleadings, defenses and stipulations, and the discovery materials contained in the appendix and exhibit made a part of the record by order entered on September 16, 1991. In addition, the parties have submitted memoranda of law on the § 1983 claim.

3. If the statute articulated how certification protects the public health, safety and welfare, it would still be incumbent on the court to undertake its own evaluation of whether the requirement serves that purpose. When considering the statute's purpose, the court is not bound by the characterization given it by the state legislature. *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). Moreover, even if the certification requirement is found to serve a legitimate purpose, that purpose must be weighed against any burden imposed on interstate commerce notwithstanding a rational relationship to the stated purpose. *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 881, 105 S.Ct. 1676, 1683, 84 L.Ed.2d 751 (1985).

tors will dispose of infectious materials in a manner that endangers the public health, safety and welfare and the environment is thus reduced.[4] They also contend that a mechanism for compelling service and settling rate disputes is the only means of insuring state-wide availability of services at reasonable rates.

The Medical Waste Act defines "infectious medical waste" as "medical waste capable of producing an infectious disease." § 20–5J–3(5). Infectious medical waste includes the following materials: (1) cultures and stocks of microorganisms and biologicals; (2) blood and blood products; (3) pathological wastes;[5] (4) sharps;[6] (5) animal carcasses, body parts, bedding and related wastes; and (6) isolation wastes.[7] The categories of materials defined by West Virginia as infectious medical waste follow guidelines established by the United States Public Health Service Center for Disease Control (hereinafter, CDC) and by the Environmental Protection Agency (hereinafter, EPA).[8] In accordance with section 20–5J–6, the Department of Health and Human Resources is in the process of promulgating rules regulating the health and safety aspects of medical waste management.

Prior to engaging in either the intrastate or interstate transportation of infectious medical waste, a motor carrier must obtain a certificate of convenience and necessity from the PSC.[9] If existing carriers object to an application for the certificate, the applicant is required to demonstrate that there is a need for the service that is not being adequately met by existing certificated carriers. If the existing service is adequate, the application will probably be denied.

Certificates of convenience and necessity grant service territories. A certificate holder cannot operate outside its service territory. Within the service territory, the PSC can compel the certificate holder to provide service to all who request it. If the customer and a certificated carrier are unable to reach agreement about the rate to be charged, the dispute can be heard by the PSC, with the PSC having the authority to set the rate. Aside from the PSC, no agency has authority to compel infectious medical waste transportation services or settle disputes over rates.

After passage of the Medical Waste Act, which became effective on February 23, 1991, several carriers holding solid waste transportation authority from the PSC acquired infectious medical waste certification authority under the grandfathering provisions of section 20–5J–10 of the Act. None of those carriers were required to show a need for the services in the territories sought to be served. At the time the court heard evidence, thirty-two of West Virginia's fifty-five counties were being served to some extent by infectious waste carriers holding authority from the PSC. In some geographical areas, carriers have overlapping territories. In other areas, only one carrier is authorized to provide

---

4. Defendants and intervenor assert that without readily available services, infectious medical waste will be disposed of as solid waste. Such action would, of course, be in violation of the Medical Waste Act and its enforcement provisions.

5. Pathological waste consists of organs, tissues and body parts removed during surgery or autopsy.

6. Sharps are articles such as hypodermic needles and scalpels which may puncture or cut the skin.

7. Regulations proposed under the Act by the Department of Health and Human Resources define "isolation wastes" as "[w]astes generated from the care of a patient who has or is suspected of having [a communicable] disease." § 64–56–3.11.

8. The CDC and EPA guidelines are substantially the same except that isolation wastes, which is included by the EPA, is only an optional category under the CDC guidelines. Although not important for our purposes, West Virginia also provides for two additional categories of infectious medical waste: (7) "[a]ny residue or contaminated soil, water or other debris resulting from the cleanup of a spill of any infectious medical waste;" and (8) "[a]ny waste contaminated by or mixed with infectious medical waste." § 20–5J–3(5)(G)–(H).

9. The certification process is explained more fully in the memorandum order of August 9, 1991, at pp. 592–93.

services, while still other areas currently have no PSC-authorized infectious medical waste transporters. The PSC has pending applications from carriers seeking authority to operate in all fifty-five counties, with some applicants seeking authority to operate state-wide. In some instances, the applicants are seeking to expand their certificated territory, while other applicants are attempting to gain market entry.

For regulatory purposes, generators of infectious medical waste are classified as small-quantity generators if they generate less than fifty pounds of infectious medical waste per month. Those who generate fifty or more pounds per month are considered large-quantity generators. Infectious medical waste is generated by hospitals, physicians, dentists, veterinarians, and health clinics. Nationwide, approximately 4% of the generators of medical waste are hospitals, yet they generate 90 to 95% of all regulated medical waste. Eighty percent of the generators are small-quantity generators such as physicians, dentists, veterinarians and clinics, who generate only about 3% of the regulated medical waste.

Approximately 70% of the infectious medical waste generated in the United States is incinerated, either on site or off site. On-site decontamination is most frequently done by large-quantity generators, with many small-quantity generators lacking on-site treatment capabilities. Of the eighty hospitals in West Virginia, approximately 60% incinerate their infectious medical waste, 20% transport it for disposal and 20% decontaminate it by autoclaving. Some of the hospitals accept infectious medical waste from doctors with staff privileges; others do not. There are no commercial incineration facilities in West Virginia. In 1990, Congress amended the Clean Air Act in a manner which may ban some incinerators now in use or require costly retrofitting to bring them into compliance

with new emission standards. As a result, incineration facilities may become more limited and the demand for transportation greater.

Intervenor offered the testimony of four individuals connected with companies currently holding PSC authority to provide infectious medical waste transportation services in designated areas of West Virginia. All of the witnesses testified that they currently provide service to small-quantity generators in rural areas at fees that are not profitable. They also testified that the tariff rates their companies have on file with the PSC declare that the tariff they charge is negotiable. They accordingly acknowledge that they can seek higher fees from unprofitable customers, although the PSC can intervene if a rate dispute arises.

All of the witnesses stated that they would not provide services to unprofitable customers if not compelled to do so and thus they opined that the PSC certification requirement is the only means of insuring reasonably priced services to all infectious medical waste generators in the state. They further testified that the needs within their certificated areas are currently being met and that their companies have the capacity to expand to adequately meet future needs.

For the most part, the companies are the only entities holding PSC authority to transport infectious medical waste in their certificated area.[10] Consequently, their interest in precluding competition by preserving the existing certification system is apparent. No other evidence was presented tending to show that a free-market economy will not satisfy the state-wide need for reasonably priced infectious medical waste transportation services. Indeed, as is discussed *infra* p. 608, in several states infectious medical waste transporters freely compete for customers. Yet no infectious medical waste generator, either from with-

---

**10.** One transporter testified that the large-quantity generators in his certificated area were served by other carriers, perhaps even one of the plaintiffs, and that he serves only some of the small-quantity generators. He was not aware of any other carriers serving small-quantity generators and assumed that they were disposing of their infectious medical waste along with their solid waste. In addition, a transporter having PSC authority to operate in Kanawha County testified that one of the plaintiffs provides back-up collection and transportation services to one hospital in his certificated territory.

in or without the state, was called to testify that services could not be obtained at an affordable rate.

Inherent in the state interest purportedly served by the certification requirement is the assumption that the public health and safety will be endangered if state-wide transportation services cannot be compelled. Nevertheless, notwithstanding the court's determination that defendants have the burden of showing that the certification requirement serves a legitimate state purpose which cannot be served by a less restrictive means, the defendants and the intervenor, in its effort to assist the defendants, offered scant evidence of how the requirement protects the public health, safety and welfare. No particularized evidence was offered to support the generalized legislative findings set out in the statute that the health and safety of the general public are endangered by exposure to infectious medical waste. Nor was any evidence offered that the health of residents in counties presently having no infectious medical waste carrier with PSC authority is more adversely affected than that of residents in counties having such service.

As to the risks associated with occupational exposure, defendants introduced tables from a September 1990 report by the Agency for Toxic Substance and Disease Registry (hereinafter, ATSDR), entitled *The Public Health Implications of Medical Waste, a Report to Congress.* The tables reflect numerical reports of medical waste-related injuries to waste collectors and handlers in seventeen states. Also tending to show occupational health risks is the parties' stipulation that the Department of Labor, Occupational Safety and Health Administration, has promulgated regulations requiring that employees in all occupations wear personal protective equipment

when "it is reasonably anticipated that an employee, in a given situation, will have contact with blood or other potentially infectious materials." Stipulation dated Nov. 11, 1991. In addition, witnesses testified that employees of PSC certificated solid waste haulers in West Virginia have been injured by needles disposed of along with solid waste. Solid waste transporters also report finding other kinds of infectious medical waste in solid waste intended for landfill disposal.

Inasmuch as the reports of injuries in West Virginia were incurred by solid waste employees, it appears that they occurred before the special provisions of the Medical Waste Act became effective. Rules proposed by the Department of Health and Human Resources under the Act provide that "[s]harps shall be collected at the point of generation in rigid, leak-proof and puncture-resistant containers clearly marked as infectious medical waste." § 64 C.S.R. 6.2.3. The rules are not yet in effect. However, once containerization becomes mandatory, the incidence of needle-stick injuries to workers in the waste transportation industry will likely be substantially reduced. In addition, with one possible exception, there is no indication that the injuries sustained by the West Virginia workers resulted in the transmission of infectious disease.[11] Nor does the ATSDR Report show whether the reported injuries occurred in states having special packaging requirements for sharps or whether the injuries resulted in infectious disease.

For their part, plaintiffs presented expert testimony about the health risks associated with exposure to infectious medical waste.[12] The expert testified that before infectious medical waste can transmit disease, the following factors must be present:

---

**11.** The possible exception involves an employee who sustained a foot injury from a needle placed in with solid waste. The foot apparently became infected, causing lost work time and concerns that amputation might be necessary. It is noted, however, that the employee did not testify and no medical evidence about the cause of the infection was offered.

**12.** Plaintiffs offered the testimony of William A. Rutala, Ph.D., M.P.H., currently the Director of the Statewide Infection Control Program at the University of North Carolina School of Medicine in Chapel Hill, North Carolina. Neither defendants nor intervenor challenged Dr. Rutala's qualifications as an expert on the health issues associated with medical waste.

A quantity or dose of an organism sufficient to induce disease;

Virulence or disease-invoking potential in the organism;

A susceptible host; and

A portal of entry.

If there is no means, such as injection or ingestion, by which the infectious organism can enter the body, it cannot induce disease. Consequently, sharps are more capable of transmitting disease than other categories of infectious medical waste because of their ability to penetrate the skin. However, the ability of sharps to pierce the skin can be reduced, if not eliminated, by placing them in puncture-proof containers. In addition, medical waste can be rendered noninfectious by incineration or steam sterilization.[13] The infectious material may be decontaminated where it is generated or it may be transported to an off-site decontamination facility.

■ Plaintiffs' expert also offered his opinion on the health risks associated with exposure to infectious medical waste. His opinions are neither contradicted by expert testimony offered by the defendants or intervenor nor by other particularized evidence admitted in the case. The court adopts the opinions he expressed.[14] The court accordingly finds that exposure to infectious medical waste poses no known risk of disease transmission to the general public. In addition, once infectious medical waste is properly identified and containerized, there is no risk to waste handlers or health care workers. If not properly containerized, there is virtually no risk, or only a remote risk, of disease transmission to waste handlers. There is, however, a risk of disease transmission to health care workers from exposure to sharps contaminated with an infectious agent. In particular, health care workers are at risk of exposure to the hepatitis B and human immunodeficiency (HIV) viruses as a result of needle-stick injuries.[15]

---

13. Steam sterilization, or autoclaving, and incineration inactivate the infectious microorganisms by exposing them to high temperatures. New decontamination methods, such as a chemical disinfectant process and microwave radiation, are also being introduced.

14. Dr. Rutala testified that his opinions are based on discussions with colleagues around the world and on the lack of epidemiological data, as reported in scientific literature, showing evidence of disease transmission to the general public or medical waste workers that is attributable to medical waste management practices. Dr. Rutala relied in part on the ATSDR Report, *supra* pp. 10–11. In the section summarizing nonsharp medical waste, the Report states: "Scientific literature does not document a single infection resulting from contact with nonsharp medical waste." A summary of the section on sharps says: "To date, scientific literature reports only one case—in a housekeeper—of bacterial infection possibly associated with the management of medical waste sharps." In addition, the summary of the section on involvement of the general public with medical waste has the following statement: "The general public not involved with in-home health care is not likely to be adversely affected by medical waste because contact with medical waste is rare." Teresa Lee, Director of Clinical Epidemiology at the Charleston Area Medical Center, the only other witness with a medical background in infectious disease control, shared Dr. Rutala's opinion that infectious medical waste constitutes no risk to the general public.

Dr. Rutala also testified that there are no reported cases documenting that a medical waste industry worker has contracted an infectious disease as a result of a needle-stick injury. Indeed, he stated that household waste, per gram, is one hundred times more microbially contaminated than medical waste and that a stick injury by a needle from a landfill is more likely to cause an infection than a needle-stick injury in a hospital setting.

Defendants and intervenor did not present a witness qualified to offer contradictory opinion testimony on the health risks associated with exposure to infectious medical waste. Intervenor sought to elicit such testimony in the evidentiary deposition of Robert Earl. However, the court finds that inasmuch as Mr. Earl's educational background is in civil engineering, with additional training in nuclear engineering, safety, radiological controls and business management, he is not qualified to give an opinion about the health risks associated with exposure to medical waste. The court previously ruled that the witnesses from whom opinion testimony was sought at hearing were likewise not qualified.

15. Inasmuch as defendants and intervenor do not suggest that the PSC's certification requirement for collectors, haulers and transporters of infectious medical waste serves to decrease the risk of disease transmission in health care workers, the court finds it unnecessary to further discuss the evidence of those occupational risks.

In its memorandum order of August 9, 1991, the court indicated that the experience in other states might be helpful in determining whether adequate state-wide services can be provided without requiring a showing of convenience and necessity. Memorandum Order, p. 601. Defendants accordingly presented evidence that the State of Washington similarly requires a transporter to make a showing of convenience and necessity prior to providing infectious waste collection and transportation services. In Washington, collectors and transporters must receive authority to operate in a specified area from the Utilities and Transportation Commission prior to handling infectious medical waste that originates in Washington.[16] Other carriers may protest the application. If a protest is received, a hearing is held at which the applicant must make a showing of public convenience and necessity. Availability of service from existing certificated carriers is considered and, if adequate, can be the basis for denying certification. Once an applicant is authorized to provide service, the Commission can compel service to everyone in the certificated area, can suspend or alter the certificate if service is inadequate, and can intervene on rate disputes to ensure their reasonableness.

In contrast to the defendants' evidence of only one other state with requirements similar to those of West Virginia, plaintiffs presented evidence about the regulation of infectious medical waste transporters in the states of Connecticut, Delaware, Illinois, Indiana, Kentucky, Louisiana, Maryland, Massachusetts, Mississippi, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, and Virginia. Although infectious medical waste transporters in those states may be required to comply with various other regulations,[17] none of those seventeen states require a certificate of convenience and necessity or any other demonstration of need for service prior to allowing the carrier to operate in the interstate transportation of infectious medical waste. Nor does any authority in those states have the power to restrict the area of service or compel service to any customer. In addition, none of those states allow a competitor to object to a newcomer's entry into the market and no one exercises control over the rates charged.

The State of West Virginia's legitimate interest in protecting the health and safety of its citizenry is not at issue in this action. Rather, the court's first area of inquiry is whether the requirement of a certificate of convenience and necessity serves that interest. In that respect, two conclusions are apparent from the evidence presented. First, outside the health care setting, there is no persuasive evidence of health risks associated with exposure to infectious medical waste. Moreover, to the extent there are risks, they can be virtually eliminated by proper containerization of sharps. Second, as just noted, one-third of the states in this country, if not more,[18] do not find it necessary to require a showing of convenience and necessity, and its concomitant restriction on competition, in order to protect their citizenry from risks associated with infectious medical waste. Consequently, the record cannot support a finding that certification plays an appreciable

16. A carrier who merely transports infectious medical waste through the state must register with the Commission and comply with its safety regulations, but the carrier is not required to obtain a certificate of convenience and necessity and is not subject to rate regulation. Neither is certification required for carriers who transport infectious medical waste from outside the state for disposal in the state.

17. For example, transporters may be under an obligation to insure that containers are not leaking. There may be additional requirements that infectious medical waste be refrigerated if it is held in storage or in transit more than a certain period of time. Some states also require that vehicles used for transporting infectious medical waste must be labeled with a biohazard sign, cannot transport other materials at the same time and must be cleaned after use. In addition to requiring compliance with various health and safety regulations, some states require a permit or vehicle registration and disclosure of fee schedules.

18. Except for Washington and West Virginia, there is no evidence before the court of any state adopting the West Virginia certification scheme.

role in protecting the health and safety of the public in general or of infectious medical waste workers.

Furthermore, even assuming certification serves, in some manner, to protect the public interest, the defendants did not meet their burden of showing that the purpose cannot be served by a less restrictive means. The plaintiffs' evidence that small-quantity rural generators can organize into buying groups having sufficient bargaining power to obtain reasonable rates was not challenged. Neither was evidence presented contradicting plaintiffs' contention that small-quantity generators have the option of transporting properly containerized and labeled materials to decontamination or disposal sites themselves. In the absence of evidence contradicting the alternatives presented by plaintiffs, defendants failed to make even a minimal showing that there are no other means of insuring state-wide availability of infectious medical waste transportation services at reasonable rates.

The court accordingly concludes that to the extent the PSC requires motor carriers to make a showing of convenience and necessity prior to engaging in the interstate transportation of infectious medical waste, the requirement violates plaintiffs' rights under the Commerce Clause of the United States Constitution.

## II. *Section 1983 Claim*

Plaintiffs' section 1983 claim asserts that the individual defendants, Griffith, Casto and Frum (hereinafter, Commissioners), or members of their staff, while acting in their official capacities and under color of statute, regulation, custom and usage of West Virginia and the PSC, deprived them of rights secured by the Commerce Clause of the United States Constitution in violation of Title 42, United States Code, section 1983. Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Suits for violations of the Commerce Clause are actionable under section 1983. *Dennis v. Higgins,* —— U.S. ——, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991).

The parties agree that there are two essential elements to a section 1983 claim. Plaintiffs must show (1) that they were deprived of a "right, privilege, or immunity secured by the Constitution or laws of the United States," and (2) that the act "complained of was committed by a person acting under color of state law." *Parratt v. Taylor,* 451 U.S. 527, 535–36, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981), *overruled in part not relevant here by Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986). In addition, the portion of section 1983 which makes a person liable when he "subjects" another to the deprivation of a constitutional right imposes the requirement that there be a causal connection between some act of the defendant and the claimed deprivation. *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978). The causation requirement is satisfied when the defendant does "an affirmative act which results in the plaintiff being deprived of his federally protected rights." *Stevenson v. Koskey,* 877 F.2d 1435, 1439 (9th Cir.1989) (citing *Johnson,* 588 F.2d at 743).[19]

Defendants contend that the section 1983 claim must fail because there is no showing that the Commissioners took any official action with respect to the plaintiffs and

---

19. The causation requirement is also satisfied if the defendant "participate[s] in the affirmative acts of another which, acting concurrently, results in the plaintiff being deprived of his federally protected rights," or "omit[s] to perform an act which he is legally required to do which causes the deprivation of the plaintiff's federally protected rights." *Stevenson,* 877 F.2d at 1439.

Plaintiffs' complaint does not allege that any acts of the intervenor were taken under color of law or that the intervenor otherwise engaged in any conduct that resulted in the deprivation of rights protected under the Commerce Clause. The § 1983 claim is accordingly deemed applicable only to the defendants.

because they have not been injured. The contentions are without merit.

Traditionally, "acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (citing *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). The defendant's conduct is also actionable under section 1983 if the alleged infringement of plaintiff's federal rights satisfies the state action requirement under the Fourteenth Amendment. *Id.* "To constitute state action, 'the deprivation must be caused by the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible,' and 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Id.* (quoting *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982)). Thus, a public employee "acting in his official capacity or while exercising his responsibilities pursuant to state law" is generally acting under color of state law. *Id.* 487 U.S. at 50, 108 S.Ct. at 2255.

■ The parties have stipulated that in an effort to enforce the certification requirement, a member of the Commissioners' staff contacted plaintiff Medigen of Kentucky and stated that criminal prosecution would be sought if the corporation continued to transport medical waste from West Virginia customers without obtaining the required certificate. The Commissioners do not claim a lack of responsibility for the actions of their staff or that the actions were not in conformity with PSC policy. Consequently, the conduct must be deemed to have occurred in the Commissioners' exercise of powers bestowed on them by the State of West Virginia. Plaintiffs need show nothing more to establish that the deprivation complained of was committed by a person acting under color of state law.

The Commissioners' efforts to enforce the certification requirement by threatening criminal prosecution also satisfies the causation requirement of section 1983 inasmuch as it was an affirmative act designed to stop the plaintiffs from engaging in the interstate transportation of infectious medical waste without obtaining a certificate of convenience and necessity. The court has determined that the defendants' certification requirement exceeds the limits permitted by the Commerce Clause. Plaintiffs have thus demonstrated that the defendants subjected them to the deprivation of a right secured by the Constitution.[20]

■ The court views the defendants' argument that plaintiffs have not been injured as being directed to the requirement that the harm complained of be the deprivation of a right protected by section 1983.[21]

---

**20.** Section 1983 does not create substantive rights. *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617–18, 99 S.Ct. 1905, 1915–16, 60 L.Ed.2d 508 (1979). Rather, it protects civil rights only in the sense that it offers "a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation." *Mitchum v. Foster,* 407 U.S. 225, 239–40 & n. 30, 92 S.Ct. 2151, 2160–61 & n. 30, 32 L.Ed.2d 705 (1972). Consequently, a plaintiff satisfies the requirement that there be a deprivation of a protected right when he is successful in his challenge to the constitutionality of a state statute. *See Lewis v. Woods,* 848 F.2d 649, 652 (5th Cir.1988) (plaintiff may recover under § 1983 if he proves a constitutional violation) (citing *Baker v. McCollan,* 443 U.S. 137, 142, 99 S.Ct. 2689, 2693, 61 L.Ed.2d 433 (1979)); *Wilson v. Stocker,* 819 F.2d 943, 950 (10th Cir.1987) (plaintiff prevailed on his

§ 1983 claim when state statute declared unconstitutional); *N.A.A.C.P. Western Region v. City of Richmond,* 743 F.2d 1346, 1358 (9th Cir.1984) (plaintiff prevailed on its § 1983 claim by demonstrating the unconstitutionality of the city's ordinance).

**21.** To the extent the defendants' contention that plaintiffs were not injured is intended to challenge plaintiffs' standing, the assertion is without merit. The "injury in fact" requirement for justiciability in a § 1983 action is the same as in other types of actions. "[A] plaintiff is not required to undergo prosecution as the sole means of seeking relief where he has alleged an intention to engage in a course of conduct that is arguably affected with a constitutional interest but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Darring v. Kincheloe,* 783 F.2d 874, 877 (9th Cir.1986) (citing *Doe v. Bolton,* 410 U.S. 179,

The question of whether rights secured by the Commerce Clause are entitled to protection under section 1983 was answered by the United States Supreme Court in *Dennis*, 111 S.Ct. 865. At the trial court level in *Dennis*, petitioner challenged the constitutionality of taxes and fees imposed by the State of Nebraska, claiming that they constituted an unlawful burden on interstate commerce. The trial court found that the taxes and fees violated the Commerce Clause but dismissed plaintiff's claim that the state was liable under section 1983. When the case reached the United States Supreme Court, the only issue presented was whether the suit could be brought under section 1983. The Supreme Court noted that section 1983 is broadly construed to provide a remedy "against all forms of official violation of federally protected rights," *id.* at 869 (quoting *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 700–01, 98 S.Ct. 2018, 2040–41, 56 L.Ed.2d 611 (1978)), and that the Commerce Clause has long been recognized as limiting the power of the states to impose substantial burdens on interstate commerce, which limitation can be enforced by injured parties in suits for injunctive and declaratory relief, *id.* 111 S.Ct. at 870. The Supreme Court thus concluded that "the Commerce Clause of its own force imposes limitations on state regulation of commerce, and is the source of a right of action in those injured by regulations that exceed such limitations." *Id.* at 872. Accordingly, the Court held that petitioner's Commerce Clause claim was actionable under section 1983 and the case was remanded for further proceedings. *Id.* at 873.

Plaintiffs, having demonstrated that the defendants, while acting under color of state law, deprived them of a right secured by the Commerce Clause of the United States Constitution, are entitled to relief under section 1983.

### III. *Conclusion*

For the reasons stated, it is ORDERED that plaintiffs' complaint for a permanent injunction and declaratory relief be, and the same hereby is, granted. It is declared that Chapter 20, Article 5J, Section 10 of the West Virginia Medical Waste act is invalid insofar as it requires "collectors, haulers and transporters of infectious medical waste who are 'common carriers by motor vehicle'" engaged solely in the interstate transportation of infectious medical waste to obtain a certificate of convenience and necessity from the Public Service Commission prior to providing those services. The defendants are, accordingly, permanently enjoined from interfering, through the use of criminal warrants or otherwise, with plaintiffs' interstate transportation of infectious medical waste from West Virginia to other states without having first obtained a certificate of convenience and necessity from the Public Service Commission.

It is further ORDERED that plaintiffs may have until February 3, 1992, to file their motion for attorney fees.

### JUDGMENT ORDER

Pursuant to the Memorandum Order this day entered herein, it is ORDERED, ADJUDGED and DECREED that:

1. Insofar as Chapter 20, Article 5J, Section 10 of the West Virginia Medical Waste Act requires "collectors, haulers and transporters of infectious medical waste who are 'common carriers by motor vehicle'" engaged solely in the interstate transportation of infectious medical waste to obtain a certificate of convenience and

---

188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973)). A credible threat of injury is likewise sufficient to satisfy the ripeness doctrine underlying the "case and controversy" requirement of Article III of the United States Constitution. *Roshan v. Smith*, 615 F.Supp. 901, 904–05 (D.C.D.C.1985). Thus, the threat of prosecution was a sufficient injury to entitle plaintiffs to bring this action.

In addition, plaintiff Medigen of Kentucky asserts, and defendants do not deny, that a member of the Commissioner's staff called one of its customers and advised that another carrier should be used because Medigen of Kentucky was operating illegally. Accordingly, Medigen of Kentucky has alleged economic injury through loss of business opportunities, which also provides them with sufficient standing to bring this action. *Fort Eustis Books, Inc. v. Beale*, 478 F.Supp. 1170, 1173 (E.D.Va.1979).

necessity from the Public Service Commission prior to providing those services, the statute be, and the same hereby is, declared a violation of rights protected by the Commerce Clause of the United States Constitution.

2. The defendant Public Service Commission of West Virginia, its commissioners, defendants Boyce Griffith, Otis D. Casto, and Richard D. Frum, and all other officers, agents, employees and attorneys of said Commission be, and the same hereby are, permanently enjoined from enforcing Chapter 20, Article 5J, Section 10 of the West Virginia Medical Waste Act against plaintiffs Medigen of Kentucky, Inc., and Medigen of Pennsylvania, Inc., insofar as it has been herein declared constitutionally impermissible.

3. Plaintiffs may have until February 3, 1992, to file their motion for attorney fees.

4. The counterclaim of intervenor, West Virginia Solid Waste Association, Inc., be, and the same hereby is, dismissed.[1]

All matters in this action having been concluded, it is further ORDERED that this civil action be, and the same hereby is, dismissed and stricken from the docket of the court.

---

**1.** The counterclaim alleges that plaintiffs are operating illegally and competing unfairly with members of the Association and seeks to permanently restrain and enjoin them from expanding their business operations in the State of West Virginia by adding customers other than those being served by plaintiffs at the time this action was initiated. Inasmuch as the court has determined that plaintiffs are not operating illegally, the intervenor is not entitled to the relief sought.