James Allen HARPER, a resident and citizen of Ohio previously doing business as Southern Ohio Disposal, and Southern Ohio Disposal LLC, an Ohio limited liability company, Plaintiffs,

v.

PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, Jon W. McKinney,[1] in his official capacity as Chairman of the Public Service Commission of West Virginia; Edward H. Staats, in his official capacity as Commissioner of the Public Service Commission of West Virginia; and R. Michael Shaw, in his official capacity as Commissioner of the Public Service Commission of West Virginia, Defendants.

WV Association of Solid Waste Haulers and Recyclers, BFI Waste Systems of North America, Inc., Stewart's Sanitation, Sunrise Sanitation Services, Inc., Tygarts Valley Sanitation, Inc., and United Disposal Services, Inc., Intervenors-defendants.

No. 2:03 CV 00516.

United States District Court, S.D. West Virginia, Charleston Division.

April 11, 2006.

---

1. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, the court has substituted the current Chairman and Commissioners of the Public Service Commission for those originally named in the Complaint who no longer serve in those capacities.

John Philip Melick, Jackson Kelly, Charleston, WV, for Plaintiffs.

Cassius H. Toon, Franklin G. Crabtree, Richard E. Hitt, Public Service Commission of West Virginia, Charleston, WV, for Defendants.

Samuel F. Hanna, Hanna & Hanna, Martin J. Glasser, Richard L. Gottlieb, Webster J. Arceneaux, III, Lewis Glasser Casey & Rollins, Eric L. Calvert, Leonard B. Knee, Bowles Rice Mcdavid Graff & Love, Charleston, WV, for Intervenors Defendants.

## *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

STANLEY, United States Magistrate Judge.

The court conducted a bench trial in this matter over a period of four days from March 7, 2006, through March 10, 2006. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the court makes the following findings of fact and conclusions of law.

### *Findings of Fact*

### *Statutory Scheme and Context*

1. West Virginia Code § 24A–2–5 (2004) provides that "[i]t shall be unlawful for any common carrier by motor vehicle to operate within this state without first having obtained from the commission a certificate of convenience and necessity." The Public Service Commission of West Virginia ("PSC") has certified motor carriage of solid waste since 1937, aside from a free market decade from 1949 to 1959. *See* Acts Reg. Sess.1949, c. 108; Acts Reg. Sess.1959, c. 146. No evidence was presented that, during the period from 1949 to 1959, reasonably priced solid waste service was not substantially available to West Virginians, or that an open market for

service led to any environmental or other problems.

2. West Virginia is one of only two states in the country that requires certification for solid waste haulers.

3. Currently, there are approximately 100 solid waste haulers in West Virginia who hold certificates under West Virginia Code § 24A–2–5. The two largest certificated solid waste haulers in the State are out-of-state companies, one of which is defendant BFI Waste Systems of North America, Inc. ("BFI").

4. In *Medigen of Kentucky, Inc. v. Public Service Comm'n,* 787 F.Supp. 590, 592–93 (S.D.W.Va.1991), the United States District Court for the Southern District of West Virginia aptly explained the certification process before the PSC.

> Upon application for the certificate, a legal notice of the application is published in the proposed area of operation and existing transporters are given the opportunity to oppose the application. If no protest is made, the certificate may be granted without hearing. If protest is received, the applicant must appear at a hearing and demonstrate that the public convenience and necessity require the proposed service. Existing transporters may present contradictory evidence.

> In considering the application, the PSC must consider the existing transportation services in the area to be served and if the existing services are "reasonably efficient and adequate," the certificate will not be granted. In addition to the required showing of convenience and necessity, applicants must show financial ability, experience and fitness. All contested applications are judged by the same legal standards. Once issued, certificates of convenience and necessity have no expiration date. The PSC has authority to require a certificate holder to provide service to all

members of the public within its certificate area. In addition, the PSC regulates other aspects of the transporter's operations, including rates charged to customers.

(citations omitted).

5. In the 1990s many landfills throughout the country closed in order to comply with certain federal environmental regulations. As such, there are fewer landfills and they are further apart, making unimpeded interstate shipment of solid waste an important concern. As of September 1, 2004, West Virginia had eighteen municipal solid waste landfills and eighteen transfer stations in operation throughout the State. (Defendants' ("Def.'s") Trial Exhibit 10, p. ES–1.)

6. In 2001, 203,869 tons of out-of-state waste were imported for disposal into West Virginia landfills; in 2003, 229, 386 tons of waste were imported. (Def.'s Trial Exhibit 10, p. ES–1.) In 2001, 431,956 tons of West Virginia waste were exported to landfills located in adjacent states; in 2003, 382,975 tons of waste were exported. (Def.'s Trial Exhibit 10, p. ES–1.)

7. The PSC does not regulate the trash rates of municipalities.

8. On February 5, 2003, the United States Court of Appeals for the Fourth Circuit, in *Medigen of Kentucky, Inc. v. Public Service Comm'n,* 985 F.2d 164 (4th Cir.1993) ("*Medigen–Fourth Circuit*") affirmed the judgment of the United States District Court for the Southern District of West Virginia in *Medigen of Kentucky, Inc. v. Public Service Comm'n,* 787 F.Supp. 590 (S.D.W.Va.1991) ("*Medigen I*") and *Medigen of Kentucky, Inc. v. Public Service Comm'n,* 787 F.Supp. 602 (S.D.W.Va.1992) ("*Medigen II*") that West Virginia Code § 20–5J–10, requiring motor vehicle common carriers engaged in the collection, hauling and transportation of

infectious medical waste to obtain certificates of convenience and necessity from the PSC, violated plaintiffs' rights under the Commerce Clause of the United States Constitution.

9. After *Medigen–Fourth Circuit*, the PSC took the position that the Fourth Circuit's decision was limited to medical waste haulers and that "[w]hether *Medigen* should be read to apply to the general transportation of solid waste is one issue upon which the Commission has not yet ruled." (Plaintiffs' ("Pl.'s") Trial Exhibit 7.) The PSC also took the position that "[t]he Transportation Division is of the opinion that the burden is on a plaintiff or complainant to demonstrate that *Medigen* is not applicable ...." (Pl.'s Trial Exhibit 7.) The PSC was looking for a test case to determine whether *Medigen* applied to solid waste haulers.

### Procedural and Factual History

10. Plaintiff Southern Ohio Disposal LLC ("SOD"), an Ohio limited liability company owned by plaintiff James Allen Harper, also a resident of Ohio, operates a solid waste disposal service. From a base in Pomeroy, Ohio, SOD employees drive garbage trucks to residences and businesses of customers in Mason County, West Virginia and Ohio, empty refuse containers into the trucks, and then drive the trucks to a transfer station in Pomeroy, Ohio or a landfill near Nelsonville, Ohio, for disposal of the waste. SOD does not dispose of waste in West Virginia. SOD vehicles bear apportioned license plates under an International Fuel Tax Agreement with the State of Ohio. SOD pays taxes to West Virginia based on the mileage accumulated in each state.

11. Neither Harper nor SOD holds any motor carrier operating authority from the PSC pursuant to West Virginia Code § 24A–2–5. Harper's business partner contacted the PSC about the need for such authority before serving their first customers in 1999, and was told none was necessary so long as SOD's vehicles had apportioned tags, fuel stickers and other requirements imposed on interstate motor carriers.

12. In 1999, General Refuse Service of Mason County, Inc. ("GRS"), whose successor in interest is BFI, held several certificates required by West Virginia Code § 24A–2–5, three of which covered Mason County. (Pl.'s Trial Exhibit 44, December 3, 1999, Letter of Transmittal.) On July 21, 1999, GRS applied to the PSC for an increase in its rates under its three Mason County certificates, requesting an increase from $11.03 per month to $18.92 per month for residential customers. (Pl.'s Trial Exhibit 44, Recommended Decision, p. 1.) On February 6, 2000, the PSC adopted the initial staff recommendation of a rate increase to $16.95 for GRS's Mason County residential customers. (Pl.'s Trial Exhibit 44, Recommended Decision, pp. 2, 4.)

13. On March 22, 2000, GRS filed a formal complaint against the Town of Mason ("Town") in the PSC, alleging that the Town violated the laws of the State of West Virginia by attempting to contract for the removal of solid waste, trash and rubbish with SOD, an entity that does not possess a certificate of convenience and necessity to operate within the Town. (Pl.'s Trial Exhibit 10, p. 1.) GRS requested the PSC to issue an order commanding the Town to cease and desist from the aforesaid alleged violation of West Virginia law. (Pl.'s Trial Exhibit 10, p. 1.) On May 24, 2000, GRS amended its complaint to name SOD. (Pl.'s Trial Exhibit 10, p. 2.) On June 21, 2000, the Town and SOD removed the PSC action to this court. *GRS v. Town of Mason, et al.,* No. 3:00–0512 (S.D.W.Va. Aug. 28, 2000); (Pl.'s Trial Exhibit 10, p. 2). On August 28, 2000, the case was

remanded to the PSC for further proceedings because, pursuant to 28 U.S.C. § 1441(a), the PSC's limited quasi-judicial functions are insufficient to view it as a state court for the purpose of removal. (Pl.'s Trial Exhibit 10, p. 2.)

14. On March 14, 2001, BFI filed with the PSC, an application for assignment and transfer of ten certificates from GRS and its affiliated companies, including the certificates covering Mason County, West Virginia. (Pl.'s Trial Exhibit 37, p. 3.) The total price of the certificates and assets was $12,855,000: $415,491 for the assets and $12,439,509 for the certificates. (Pl.'s Trial Exhibit 37.) The purchase of GRS by BFI included approximately 30,000 customers, although of that number, there were 4,000 residential customers in Ohio and 1,000 to 1,800 commercial customers.

15. The PSC requires a purchasing entity to charge customers the same rates as the selling entity, unless and until the PSC approves a rate change. The rate BFI charges its Mason County residential customers includes, in addition to the $16.95 base rate, a bulky goods surcharge of 50 cents and a (temporary) fuel surcharge of 86 cents, bringing the total monthly rate to $18.31. (Def.'s Trial Exhibit 12, Attachment A, p. 2.)

16. After the purchase of GRS by BFI, BFI continued to pursue the PSC proceeding against Harper and SOD.

17. Following a hearing in the PSC case against the Town of Mason and SOD on April 4, 2001, and briefing by the parties, Administrative Law Judge ("ALJ") Melissa K. Marland issued a Recommended Decision on July 9, 2001, wherein she determined that Harper, doing business as SOD, could not be required to obtain a certificate of convenience and necessity from the PSC because that requirement constitutes an unlawful burden on interstate commerce as defined in *Medi-gen–Fourth Circuit*. (Pl.'s Trial Exhibit 10.)

18. BFI and the PSC's staff took exception to the Recommended Decision of ALJ Marland, and certain parties, including the West Virginia Association of Solid Waste Haulers and Recyclers ("SWH"), Sunrise Sanitation Services, Inc., United Disposal Services, Inc., Tygart's Valley Sanitation, Inc., Stewart's Sanitation and others, were allowed to intervene. (Pl.'s Trial Exhibit 11, pp. 5, 7, 13.)

19. On October 21, 2002, the PSC issued an order in which it rejected the recommended decision of ALJ Marland, granted the relief originally sought by GRS, and ordered that Harper, doing business as SOD, must cease and desist from collecting solid waste in West Virginia until he obtained a certificate of convenience and necessity, pursuant to West Virginia Code § 24A–2–5. (Pl.'s Trial Exhibit 11, p. 40.)

20. On October 30, 2002, Harper petitioned the PSC to reconsider its decision or to conduct a further hearing to address its findings and conclusions set forth in the October 21, 2002, Commission Order. (Pl.'s Trial Exhibit 12, p. 1.) On May 30, 2003, the PSC denied Harper's request for reconsideration. (Pl.'s Trial Exhibit 12, p. 17.) On June 2, 2003, Harper petitioned the PSC to stay the May 30, 2003, Commission Order. (Docket Sheet Document # 1, Exhibit 5.) At the time the Complaint was filed in this court on June 6, 2003, the PSC had taken no action with respect to the June 2, 2003, petition.

21. Plaintiffs, Harper and SOD, filed this action on June 6, 2003, alleging that the certification requirement violates the Commerce Clause, that State statutes were misapplied and that the PSC and its Commissioners (collectively referred to as the "PSC"), acting under color and pre-

tense of State statute, regulation and customs and usages, engaged in illegal conduct as alleged in the Complaint to injure Plaintiffs and deprive them of their rights, privileges and immunities secured by the Commerce Clause of the United States Constitution and 42 U.S.C. § 1983. (Docket Sheet Document # 1, ¶¶ 18, 19, 20–24.) Plaintiffs seek a temporary restraining order and, thereafter, preliminary and permanent injunctions against the PSC, prohibiting the enforcement of PSC orders or otherwise interfering with SOD's interstate transportation of solid waste from West Virginia and other states. (Docket Sheet Document # 1, Prayer for Relief.) Plaintiffs further request that the court declare the rights, duties and obligations of the parties with respect to such transportation and other aspects of SOD's business, resolve Plaintiffs' challenges to the PSC orders, and award Plaintiffs their fees and costs pursuant to 42 U.S.C. § 1988. (Docket Sheet Document # 1, Prayer for Relief.)

22. On June 11, 2003, the PSC stayed its earlier cease and desist order until July 26, 2003. (Docket Sheet Document # 3, Exhibit 2.) The parties have extended this stay by verbal agreement. SOD currently has approximately 1,000 to 1,100 customers in Mason County. SOD has not taken on additional customers pending the outcome of this litigation.

23. On November 19, 2003, this court ruled on Defendants' motions to dismiss and abstained pursuant to *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). *Harper v. Public Service Comm'n*, 291 F.Supp.2d 443 (S.D.W.Va.2003). On January 24, 2005, the United States Court of Appeals for the Fourth Circuit reversed this court's decision to abstain. *Harper v.*

*Public Service Comm'n*, 396 F.3d 348 (4th Cir.2005).

24. Following remand from the Fourth Circuit and despite opposition from Plaintiffs, the court permitted discovery.

25. On February 27, 2006, the court denied Plaintiffs' Renewed Motion for Summary Judgment. *Harper v. Public Service Comm'n*, 416 F.Supp.2d 456 (S.D.W.Va.2006). The court rejected Plaintiffs' argument that West Virginia Code § 24A–2–5 is *per se* invalid and not subject to further inquiry under *Buck v. Kuykendall*, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623 (1925) and *George W. Bush & Sons Co. v. Maloy*, 267 U.S. 317, 45 S.Ct. 326, 69 L.Ed. 627 (1925). *Harper*, 416 F.Supp.2d at 476–77. The court acknowledged the Fourth Circuit's recent decision in *Yamaha Motor Corp. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 568 (4th Cir.), *cert. denied sub. nom. Smit v. Yamaha Motor Corp.*, —— U.S. ——, 126 S.Ct. 422, 163 L.Ed.2d 322 (2005) and *Jim's Motorcycle, Inc. v. Smit*, —— U.S. ——, 126 S.Ct. 422, 163 L.Ed.2d 322 (2005), wherein the Fourth Circuit described the applicable two-tiered test to be used in a Commerce Clause analysis. The first tier is known as the "discrimination tier" and the other, enunciated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), is known as the "undue burden" tier. *Harper*, 416 F.Supp.2d at 475–76. This court observed that pursuant to the discrimination tier,

[a] "state law [that] discriminates [against interstate commerce] facially, in its practical effect, or in its purpose," [citation omitted], will be struck down unless the state demonstrates "both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means," *Maine v. Taylor*, 477

U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). *Yamaha,* 401 F.3d at 568.

"Under the undue burden (or *Pike* balancing) tier, '[w]here a statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. 844, 25 L.Ed.2d 174). *Harper,* 416 F.Supp.2d at 475–76. In addition, this court acknowledged the statement in *Pike* that

> "[i]f a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

*Harper,* 416 F.Supp.2d at 470–71 (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. 844). The court determined that West Virginia Code § 24A–2–5 does not discriminate facially, in practical effect or in its purpose, thereby implicating the discrimination tier. *Harper,* 416 F.Supp.2d at 476–78. The court determined that West Virginia Code § 24A–2–5 regulates evenhandedly with only an incidental effect on interstate commerce, thereby implicating the *Pike* balancing test. *Harper,* 416 F.Supp.2d at 478–80.

The court noted the observation of *Medigen–Fourth Circuit* that "'[b]ecause market entry is only permitted if the Commission determines that the market is not adequately being served, the certification requirement necessarily limits competition, thereby implicating the dormant commerce clause.'" *Harper,* 416 F.Supp.2d at 477–78 (quoting *Medigen–Fourth Circuit,* 985 F.2d at 166).

In addition, the court found that as in *Yamaha, Pike* "'balancing is therefore appropriate in cases like this one, where interstate commerce is burdened by a state law that imposes barriers to market entry.'" *Harper,* 416 F.Supp.2d at 477–78 (quoting *Yamaha,* 401 F.3d at 572–73).

26. The court presided over a four day bench trial at which the burden was on Plaintiffs to prove the elements of *Pike.*

### *Putative Local Benefits*

27. Defendants, in defense of the certification system, suggest that four putative local benefits justify the system's burden on interstate commerce, although none of the benefits is set forth in the statutory scheme. The benefits are said to be: (1) universal service at (2) reasonable rates; (3) protection of the environment; and (4) redress for aggrieved consumers. As set forth below, the certification system achieves none of these purported benefits. The PSC also asserts that solid waste hauling is properly treated as a "public utility," like water and sewer service. The evidence contradicts this assertion as well.

### *1 and 2. Universal Service at Reasonable Rates*

28. According to the PSC, the purpose of requiring a solid waste hauler to obtain a certificate pursuant to West Virginia Code § 24A–2–5 is to further the goal of universal trash service to the citizens of West Virginia at reasonable rates. This goal purportedly is part of the State's expansive solid waste scheme that encompasses several State agencies, including the PSC.

29. "Universal service" at "reasonable rates" is not an explicitly stated purpose or legislative finding in West Virginia Code § 24A–2–5. West Virginia Code § 24A–1–1 sets forth the legislature's purpose and policy in enacting chapter 24A:

It is hereby declared to be the purpose and policy of the Legislature in enacting this chapter to confer upon the public service commission of West Virginia, in addition to all other powers conferred and duties imposed upon it by law, the power, authority and duty to supervise and regulate the transportation of persons and property for hire by motor vehicles upon or over the public highways of this state so as to ... [p]rotect the safety and welfare of the traveling and shipping public in their use of transportation agencies by motor vehicle; ... preserve, foster and regulate transportation and permit the coordination of transportation facilities; ... [and] provide the traveling and shipping public transportation agencies rendering stabilized service at just and reasonable rates.

W. Va.Code § 24A–1–1 (2004).

*Universal Service*

30. "Universal service" is a goal of other West Virginia laws, notably W. Va.Code § 22C–3–9 (2005), relating to solid waste disposal sheds, and W. Va.Code § 22–15–1(a) (2002), setting forth the purpose of the West Virginia Solid Waste Management Act. "Universal service" is also a goal of the West Virginia Solid Waste Management Plan 2005 ("the 2005 Plan").

31. In the West Virginia Solid Waste Management Act, enacted in 1994, the West Virginia legislature professed its purpose of "establish[ing] a comprehensive program of controlling all phases of solid waste management", West Virginia Code § 22–15–1(a), and found that

solid waste disposal has inherent risks and negative impact on local communities and specifically finds the following: (1) Uncontrolled, inadequately controlled and improper collection, transportation, processing and disposal of solid waste is a public nuisance and a clear and present danger to people; (2) provides harborages and breeding places for disease-carrying, injurious insects, rodents and other pests harmful to the public health, safety and welfare; (3) constitutes a danger to livestock and domestic animals; (4) decreases the value of private and public property, causes pollution, blight and deterioration of the natural beauty and resources of the state and has adverse economic and social effects on the state and its citizens; (5) results in the squandering of valuable nonrenewable and nonreplenishable resources contained in solid waste; (6) that resource recovery and recycling reduces the need for landfills and extends their life; and that (7) proper disposal, resource recovery or recycling of solid waste is for the general welfare of the citizens of this state.

32. The stated purpose of the Solid Waste Management Board Act is as follows:

The Legislature finds that uncontrolled, inadequately controlled and improper collection and disposal of solid waste (1) is a public nuisance and a clear and present danger to people; (2) provides harborages and breeding places for disease-carrying, injurious insects, rodents and other pests harmful to the public health, safety and welfare; (3) constitutes a danger to livestock and domestic animals; (4) decreases the value of private and public property, causes pollution, blight and deterioration of the natural beauty and resources of the state and has adverse economic and social effects on the state and its citizens; and (5) results in the squandering of valuable nonrenewable and nonreplenishable resources contained in solid waste.

Further, the Legislature finds that governmental agencies in the state and

the private sector do not have the financial and other resources needed to provide for the proper collection and disposal of solid waste; that solid waste disposal sheds and projects must be established on a relatively large scale to be economically feasible and stable; and that proper solid waste collection and disposal at the lowest minimum cost can only be achieved through comprehensive solid waste management.

It is declared to be the public policy and a responsibility of this state to assist efforts of governmental agencies and the private sector to provide for the proper collection, disposal and recycling of solid waste and to solve and prevent the problems set forth in this article. It is the purpose and intent of the Legislature in enacting this article to provide for the necessary, dependable, effective and efficient collection, disposal and recycling of solid waste and to assist and cooperate with governmental agencies and the private sector in achieving all the purposes set forth in this article, and to encourage the recycling or extraction of recoverable resources from such solid waste.

The Legislature finds that the public policy and responsibility of the state as set forth in this section cannot be effectively attained without the funding, establishment, operation and maintenance of solid waste disposal projects as provided in this article.

W. Va.Code § 22C–3–2.

33. In West Virginia Code § 22C–3–9, related to development and design of solid waste disposal sheds, the Solid Waste Management Board is charged with geographically dividing the state into solid waste disposal sheds to achieve "[t]he goal of providing solid waste collection and disposal service to each household, business and industry in the state . . . ."

34. The 2005 Plan states that

[t]he primary objective of developing and implementing a comprehensive state plan should be to protect the public safety, health and welfare of its citizens by:

* Providing for the safe and sanitary disposal of solid waste from all residential, commercial and industrial sources;

* Reducing the degradation of both ground and surface waters by eliminating open dumps, the promiscuous discarding of solid waste, and other deleterious methods of solid waste disposal;

* Eliminating the harborage and breeding places of insects and rodents that carry disease or are otherwise injurious to the public health, safety, and welfare;

* Reducing the volume of recyclable materials entering the waste stream; and

* Increasing the property values and restoring the natural beauty of the state by removing unsightly litter and open dumps from roadsides, streams, and other public places.

(Def.'s Trial Exhibit 10, p. 1–9.)

35. There are certified haulers in almost every area of the State, but there are uninhabited areas of the State where there are no certified haulers. There are a few inhabited areas where no hauler has sought certification.

36. Although there may be one or more certified haulers for almost every inhabited area in West Virginia, the certification requirement does little to ensure universal *use* of the service.

37. Persons occupying a residence in West Virginia are not required to subscribe to a trash hauling service certified by the PSC. West Virginia Code § 22C–4–10(a) (2005) states that "[e]ach person occupying a residence or operating a business establishment in this state shall either . . . [s]ubscribe to and use a solid waste collection service and pay the fees estab-

lished therefor; or ... [p]rovide proper proof that said person properly disposes of solid waste at approved solid waste facilities or in any other lawful manner."

The PSC has no way of forcing a person occupying a residence in West Virginia to use a certified hauler, nor does it ensure that residents who do not subscribe to a hauling service are disposing of their trash in a lawful manner.

38. Rules promulgated by the PSC require that

[e]very common carrier of solid waste shall, on an annual basis, provide a listing of its industrial, commercial and residential customers, including names and service addresses or, in the alternative, a listing of the names and addresses of non-subscribing waste generators in its service area, to each county or regional solid waste authority having jurisdiction in the carrier's operating territory and to the West Virginia Division of Environmental Protection Solid Waste Management Board. The express purpose of this Rule is to assist such authorities in enforcing W. Va.Code § 22C-4-10 and other applicable laws.

150 CSR 9-6.5 (2003); (Def.'s Trial Exhibit 8).

The PSC does nothing to assure that universal service is actually achieved; i.e., that the customers on the haulers' lists (if the lists are actually submitted to the respective solid waste authority in compliance with the above-referenced Rule), comprise all residences in a particular area or that these customers are actually subscribing to service from a certified hauler or otherwise disposing of their trash lawfully.

39. Until recently, BFI has not compiled customer lists in compliance with the above Rule.

40. When an applicant applies for a certificate pursuant to West Virginia Code § 24A-2-5, it is the applicant who chooses the area to be served, not the PSC. For example, the PSC allows an applicant to propose service solely to an incorporated area to the exclusion of unincorporated portions of a county. The PSC has facilitated so-called "cherry picking" by issuing certificates for relatively populous or otherwise desirable portions of the State, without requiring service to more rural areas.

41. When unincorporated areas are within the application for a certificate, additional territory is sometimes urged upon the applicant, but this is done simply to make it easier to describe the geographic area covered by the certificate, not to promote universal service. The description of geographic areas covered by a certificate is based on administrative expediency and clear identification of landmarks, rather than the goal of universal service.

42. No applicant has ever refused to modify the scope of an application.

43. If service is available in a given locale, it is because at least one hauler *desires* to serve that market, not because the PSC has *required* a hauler to embrace a larger geographic operating territory than that originally sought.

44. There may be certain service areas that are covered by more than one certified hauler. If a given market area is served by two or more certified haulers, then the PSC treats the application of one such competitor to transfer its certificate to the other incumbent, leaving but one service provider, the same as the application of one such competitor to a third party, leaving two certified haulers in place.

In instances where more than one certified hauler serves a particular geographic

area, haulers may enter into "gentlemen's agreements" that each hauler will serve a distinct portion of a service area to avoid overlap. The PSC is aware of, but takes little or no action to prevent these so-called "gentlemen's agreements." Persons occupying residences in an area where haulers have entered into a "gentlemen's agreement" are not informed that there is another certified hauler who could pick up their trash.

45. The PSC generally allows a certificant to abandon its operating authority.

46. As administered by the PSC, the certification scheme establishes the service territories of certificate holders as monopolies based on the desires of the haulers and with an eye toward administrative expediency, but does little to further the goal of universal service. Despite these facts, certificates cover virtually the entire State. This appears to be attributable to the profitability of trash-hauling.

*Reasonable Rates*

47. The certification requirement does not guarantee or even promote reasonable rates to customers who subscribe to service from a certified hauler.

48. Although the PSC recently compiled a list of haulers and their rates listed by county at the request of a member of the West Virginia House of Delegates, the PSC does not routinely maintain lists of haulers by county (or any other region or geographic delineation) and their rates. (Def.'s Trial Exhibit 12, Attachment A.) Consequently, such information is not used by the PSC in setting rates.

49. There is wide disparity in rates throughout the State and even among haulers within the same county. For example, in Mason County, the certified hauler, BFI, charges $17.45 per month plus a fuel surcharge of 86 cents, while SOD, which is not certified, charges $14.00 per month. (Pl.'s Trial Exhibit 42.)

In Cabell County, BFI holds three certificates and another company holds a fourth certificate. BFI's Cabell County monthly rates are $20.93, $11.76 and $18.31, while the company that holds the fourth certificate charges $16.05 per month. (Def.'s Trial Exhibit 12, Attachment A.)

BFI charges different rates within the same county because it bought out different certificate holders, and in so doing, was required to adopt the selling entity's rates.

In Greenbrier County, Greenbrier Valley Solid Waste, Inc. charges $18.31 per month, while Western Greenbrier Disposal Service charges $9.35 per month. (Def.'s Trial Exhibit 12, Attachment A.)

In Logan County, BFI charges $19.29 per month, while Waste Management of West Virginia, which holds four certificates in Logan County, charges $8.03, $21.72, $15.26 and $20.17. (Def.'s Trial Exhibit 12, Attachment A.)

50. The PSC does not monitor or compare the rates charged in other states, including those that allow competition among haulers.

51. Rates are generally lower in Ohio, where there is no certification requirement and where haulers can serve anyone they choose. (Pl.'s Trial Exhibit 42.) Ohio requires haulers to obtain permits from the county health office or comparable agencies, and haulers are subject to permit revocation if they spill garbage or otherwise endanger the public health.

In Ohio, BFI charges customers in Meigs County, a county with fifty four persons per square mile and nineteen percent of the population below the poverty line, $14.00 per month, while BFI's customers in bordering Mason County, a

county with sixty persons per square mile and twenty percent of the population below the poverty line, are charged $17.45 per month, not including a fuel surcharge. (Pl.'s Trial Exhibit 42.)

52. The PSC does not initiate changes in rates because they are too high or too low; rather it is the certified hauler who must ask for a rate increase (or in the rare event, a rate decrease). Even when a certificate is transferred to another hauler, the transferee is required to accept the rate of the transferor unless and until it applies for a rate increase at the PSC.

53. Six years after BFI acquired GRS's Mason County certificates, BFI has not asked the PSC for a rate increase. BFI is still operating profitably in Mason County without any increase in the base rate, even though every aspect of BFI's business has since become more costly, and BFI has lost over 1,000 customers to SOD.

54. A customer could petition the PSC for a rate review of a hauler, although Paul Stewart, Deputy Director of the PSC's Utilities Division, could not identify any instance when this had occurred.

55. When rates are reviewed at the behest of the hauler, the PSC utilizes an operating ratio model, under which certificants are allowed to earn an approximate five percent profit based on audited, historic financial records. The only comparison of such costs for reasonableness are those of other PSC-regulated certificants, not firms operating competitively in other jurisdictions. Under the PSC's approach to rate making, haulers' rates are designed to recover test year expenses, plus profit. This rudimentary means to derive an appropriate, purportedly "cost-based" rate is widely recognized by economists as unsatisfactory. While such expenses as charitable contributions can be and are eliminated from test year operating expenses for rate making purposes, the PSC can not and

does not rigorously evaluate the efficiency of hauler routes, employment levels or expenses.

56. The operating ratio model actually rewards haulers for increasing test year operating expenses, contrary to the forces of competition.

57. Once the base rate is determined, there are a number of surcharges added to compensate for landfill expenses, optional recycling, bulky goods and increased fuel costs. The fuel surcharge currently is just under five percent. The fuel surcharge does not reflect any consideration as to how far a particular hauler has to drive to serve its customers. The fuel surcharge is tied only to the base rate, so that the higher a hauler's rates, the larger the fuel surcharge, regardless of actual miles driven by the hauler.

58. While the PSC contends that its rate making process subsidizes higher costs in more rural and sparsely populated areas by spreading the additional cost involved in serving those areas to more densely populated urban areas where costs are lower, known as "cross subsidization," the PSC offered no evidence that factors related to cross subsidization were actually considered in the rate making process or in evaluating requests for rate increases.

59. Contrary to Defendants' assertions, West Virginia Code § 24A–2–5's certification requirement does not promote the goal of reasonable rates.

3. *Environmental Benefits*

60. Richard Cooke, the Chief Executive Officer of the West Virginia Solid Waste Management Board, testified that certification of solid waste haulers by the PSC is one component of an integrated and efficient system for managing solid waste in West Virginia. The goals of this comprehensive solid waste scheme include

reducing, reusing and recycling solid waste.

61. The Solid Waste Management Board Act, West Virginia Code § 22C–3–23, states that "[s]olid waste collectors and haulers who are 'common carriers by motor vehicle,' as defined in . . . [§ 24A–1–2] . . . shall continue to be regulated by the public service commission in accordance with the provisions of . . . [§ 24A–1–1 et seq.] and rules promulgated thereunder." The statute further provides that

> [n]othing in this article gives the board any power or right to regulate such solid waste collectors and haulers in any manner, but the public service commission, when it issues a new certificate of convenience and necessity, or when it alters or adjusts the provisions of an existing certificate of convenience and necessity, or when it approves the assignment or transfer of any certificate of convenience and necessity, shall consult with the board regarding what action it could take which would most likely further the implementation of the board's solid waste disposal shed plan and solid waste disposal projects and shall take any reasonable action that will lead to or bring about compliance of such waste collectors and haulers with such plan and projects.

W. Va.Code § 22C–3–23.

62. There was no evidence offered at trial which suggested that the PSC complies with West Virginia Code § 22C–3–23's requirement of consulting with the Solid Waste Management Board when the PSC issues, alters or approves the transfer of certificates. When asked whether the PSC's implementation of West Virginia Code § 24A–2–5 furthers the goal of recycling in West Virginia, Mr. Cooke was unfamiliar with West Virginia Code § 24A–2–5.

63. In the section of the 2005 Plan summarizing the PSC's responsibilities related to solid waste management, the certification system is not mentioned. (Def.'s Trial Exhibit 10, pp. 1–15 through 1–16.) The 2005 Plan refers to the PSC only with respect to the certification of solid waste facilities (i.e., landfills) and hauler participation in recycling programs. (Def.'s Trial Exhibit 10, pp. 1–15 to 1–16 and 5–19.)

64. According to the 2005 Plan, the West Virginia Recycling Act established recycling goals that would reduce the per capita disposal of solid waste twenty percent by January 1, 1994, thirty percent by January 1, 2000, and fifty percent by January 1, 2010. (Def.'s Trial Exhibit 10, p. ES–2.)

65. In 150 CSR 9–6.4.a, the PSC requires that "[e]very motor carrier of solid waste shall participate in a recycling program which attempts to address at least thirty (30) percent of the waste stream generated by said carrier's customers." (Def.'s Trial Exhibit 8.) The 2005 Plan states, "[t]here are no mandatory or voluntary reporting requirements in this regulation to assess effectiveness or participation" related to this PSC Rule. (Def.'s Trial Exhibit 10, p. 5–19.) The PSC offered no evidence that it makes any effort to enforce 150 CSR 9–6.4.a.

66. Mr. Stewart, Deputy Director of the PSC's Utilities Division, testified that while haulers may offer a recycling service to their customers and add a recycling surcharge, this is optional, and customers of haulers who offer this monthly rate can decline it. The PSC does not monitor certified haulers to determine whether they actually recycle items left out by customers who subscribe to the optional service.

67. The 2005 Plan's section on Mason County's recycling does not mention solid waste haulers. (Def.'s Trial Exhibit 10, p.

D–40.) BFI does not collect recycling from homes in Mason County; it has some drop boxes and, in partnership with the Mason County Solid Waste Authority, provides containers to the Authority at its recycling site.

68. Only four of West Virginia's 55 counties have recycling ordinances. (Def.'s Trial Exhibit 10, p. 5–8.) The 2005 Plan does not indicate what percentage of trash is recycled in West Virginia. One publication estimated the percentage of municipal solid waste recycled in West Virginia in 2002 to be 6.9 percent. (Pl.'s Trial Exhibit 43, p. 35, Table 3.) That same publication estimated the national average of municipal solid waste recycled in 2002 to be 26.7 percent. (Pl.'s Trial Exhibit 43, p. 35, Table 3.)

69. The evidence offered at trial does not support the assertion that the regulation of solid waste haulers through the certification system is an essential or effective component of West Virginia's comprehensive solid waste scheme. There is no evidence that the certification requirement, in theory or in practice, supports West Virginia's recycling goals. By Mr. Cooke's candid admission, none of the State's recycling and other environmental objectives are dependent upon, or even substantially related to, the PSC's restriction of entry into the solid waste hauling market.

### 4. Consumer Protection

70. If a consumer is dissatisfied with rates or any other aspect of service, he or she may file an informal or formal complaint with the PSC. To that end,

> [e]very bill or invoice issued by, or on behalf of . . . a motor carrier of household goods or solid waste, must include the following words in bold capital letters: **THE RATES AND PRACTICES OF THIS MOTOR CARRIER ARE REGULATED BY THE PUBLIC SERVICE COMMISSION OF WEST VIRGINIA. IF YOU FEEL THAT YOU HAVE BEEN OVERCHARGED OR TREATED UNFAIRLY, YOU MAY CALL 1–800–642–8544 TO OBTAIN INFORMATION ABOUT FILING A COMPLAINT.**

150 CSR 9–3.26; (Def.'s Trial Exhibit 8).

71. S. Thornton Cooper, who worked twenty-five years at the PSC and spent the last fifteen in the position of "gatekeeper," reviewing certificate of need applications, did not know the rate of compliance with this Rule. He acknowledged that if a consumer were not already aware of the PSC's role, absent this information on the bill, the consumer would not know to contact the PSC about a complaint related to a hauler.

72. BFI does not currently include this information on its bills in West Virginia. (Pl.'s Trial Exhibit 39.)

### 5. Public Utility

73. The PSC, primarily through its expert David J. Ellis, asserts that solid waste collection is appropriately regulated in West Virginia much like other public utilities such as electric, gas, water and sewer. Mr. Ellis, who worked at the PSC for forty years, primarily as Director of the Utilities Division, asserts that because solid waste haulers serve fixed location customers over a route, "[i]t is this route function of solid waste collection that moves that service away from the category of a potentially efficient competitive service and toward the category of a service that may not provide universal service at affordable rates unless it is regulated as a public utility." (Def.'s Trial Exhibit 1, p. 7.)

74. Traditional market entry and rate regulation have been abandoned with respect to buses, trucks, airlines, electricity

generation, and many other industries, as economists, legislators, and courts have determined that these markets are contestable. "Contestable markets are those in which suppliers can easily and relatively costlessly enter or exit the business." (Pl.'s Trial Exhibit 40, p. 7.) In a contestable market with free competition, monopoly exploitation is not a concern. "As long as government allows free unencumbered entry and exit, any monopolist has to look over his shoulder for competition. If a monopolist raises prices too high, competition would act to restrict monopolistic practices." (Pl.'s Trial Exhibit 40, p. 7.)

75. Many states have moved away from government regulation with respect to the solid waste collection and transportation industry. Today, only West Virginia and Washington still address solid waste collection and transportation services through governmental regulation of market entry.

76. Absent government regulation, the solid waste hauling market is highly contestable, i.e., it has relatively low barriers to entry and exit, and therefore is highly susceptible to the benefits of free market competition. In particular, in a free market "[t]he threat of unrestricted entry and the ease of exit discipline any tendency to overcharge." (Pl.'s Trial Exhibit 40, p. 8.) In addition, solid waste hauling does not involve massive capital expenditures.

77. The PSC's argument that solid waste hauling is akin to a public utility and should be treated as such is unconvincing.

### Summary: Local Benefits

78. The certificate requirement of West Virginia Code § 24A–2–5 fails to promote, support or achieve the putative local benefits of universal service at reasonable rates, protection of the environment, and redress for aggrieved customers. The certification system deprives consumers of choice among competing firms, dampening the incentive for competitive pricing, innovation, flexibility, service quality and reliability, and operating efficiency.

### Burden

79. The certificate requirement of West Virginia Code § 24A–2–5 is a substantial barrier to entry of the trash collection and disposal market. It is difficult, if not impossible, for new haulers to enter the West Virginia solid waste hauling market if a certificate is in place.

80. Almost every area in West Virginia has a certified hauler or haulers and, as a result, with rare exception, firms enter the market only through acquisition of companies who hold existing certificates, as opposed to *de novo* application pursuant to West Virginia Code § 24A–2–5. The issuance of certificates is a government function; nonetheless the public received no monetary benefit from the sale of the certificates by GRS to BFI. In fact, any certificate holder can enjoy a substantial windfall by applying for and receiving a significant rate increase and then promptly selling the certificate, just as GRS did in Mason County.

81. If a hauler cannot afford the significant sums paid to acquire a company that holds a certificate for a given area, ($12 million paid by BFI for GRS's certificates), the only other option, pursuant to West Virginia Code § 24A–2–5, is to prove to the PSC that the existing certificant is not providing reasonably adequate service. *See Stowers and Sons Trucking Co., Inc. v. Public Service Comm'n*, 182 W.Va. 374, 387 S.E.2d 841, 848 (1989) (finding that under West Virginia Code § 24A–2–5, PSC must consider sufficiency of existing service).

82. Mr. Cooper testified that the PSC has not formulated a test, standard or any other guide for an applying hauler to prove

a lack of reasonably adequate service by an existing hauler, other than what exists in case law and in any advice he gives to someone who might ask.

83. It is extremely difficult to obtain a certificate in the face of a protest. An applicant must hire local counsel, appear at a hearing, and attempt to secure the testimony of customers of the incumbent certificant(s). Even then, an applicant stands little chance of success. In markets served by more than one certificant, the applicant must prove that each incumbent is failing to provide reasonably adequate service.

84. The PSC has enacted rules that require certificants to provide toll-free telephone service to customers, and to maintain a place of business convenient to a majority of the hauler's customers where they can make payments for service. 150 CSR 9–6.2.d and 9.6.2.f; (Def.'s Trial Exhibit 8). These rules constitute additional burdens on haulers based out of State.

85. The statutory scheme effectively prevents would-be providers of service from entering the market in West Virginia and, as such, there is a significant burden on interstate commerce that outweighs the purported local benefits. Moreover, the various goals cited above could be promoted as well with a lesser impact on interstate activities.

*Less Restrictive Alternatives*

1. *Free Competition*

86. As discussed above, the solid waste hauling market is highly contestable and thus is susceptible to the benefits of free market competition. There is no evidence in the peer reviewed economic literature or presented to the court to suggest that a competitive market has left any significant community of waste generators without disposal options. In a free market scenario, customers who are expensive to serve are left out of the market no more than they would be under a government monopoly. (Pl.'s Trial Exhibit 40, p. 8.)

87. In rural southeastern Ohio, solid waste haulers operate efficiently in an open market with virtually no market barrier other than health and safety inspections. A person with a properly outfitted pick-up truck can conduct a small waste hauling business in remote areas, while larger businesses provide service to more densely populated regions.

88. To the extent universal service is desired, this is a societal goal and

is independent of market structure. Whether the service is provided by competitors, a monopolist, or government itself, serving high-cost customers will require adjusting prices. These customers can either be charged more for the higher cost of service or they can be subsidized with tax revenue or other revenue from the low-cost class of customer. The subsidy can be explicit, in the form of different fees charged customers on their bill. Or, the subsidy can be hidden, if customers are charged a uniform price but cross subsidies occur in internal cost allocation by the supplier. Or, the pricing policy may involve a "universal service fee tax," levied on all customers. Proceeds in this case are typically intended to be used to pay for service to the high-cost customers, as is the case with the federal fee for universal telecommunications service.

(Pl.'s Trial Exhibit 40, p. 8.)

89. West Virginia can continue to enforce mandatory disposal laws on generators of solid waste, and environmental regulations on haulers, without restricting entry into the hauling market.

90. The court is unpersuaded by the testimony of Defendants' experts, Mr. Ellis and BFI's expert, Patrick C. Mann,

Ph.D., that competition for collection of solid waste, rather than the certificate system, would lead to higher rates, particularly in areas that are less densely populated. Dr. Mann testified that while competition may be beneficial in the more urban areas of West Virginia, it would be detrimental in rural areas such as Pocahontas County where rates would likely increase in a free market scenario. Mr. Ellis stated that competition would make it impossible to maintain average rates by shifting cost recovery to urban areas, thereby jeopardizing universal service at reasonable rates to the rural population in West Virginia, which, on a percentage basis, is one of the highest in the United States. Dr. Mann admitted that his testimony was based on nothing more than "professional conjecture." Mr. Ellis testified that for purposes of developing his opinions, he consciously avoided reviewing any published literature in the applicable fields.

91. The evidence presented at trial did not establish any substantial correlation between customer density and rates. (Pl.'s Trial Exhibit 42.) The opinions and conclusions offered by Defendants' experts, Dr. Mann and Mr. Ellis, as to the ill effects of competition on rural residents in West Virginia, are untested and entirely speculative. Defendants' assertions about the ill effects of competition are reminiscent of those same arguments made in *Medigen*, wherein the Fourth Circuit aptly found that "[b]ecause the 'ruinous' effects of competition are entirely speculative, their prevention cannot justify restricting market entry." *Medigen–Fourth Circuit*, 985 F.2d at 167.

## 2. *Competitively Bid Contracts or Franchises*

92. The evidence establishes that local, competitively bid contracts or franchises can be used to achieve the goals of universal service at reasonable rates. The court is unpersuaded by Defendants' assertion that franchises or contracts are barriers to market entry that are more onerous than the PSC's certification scheme. This is arguable only in those instances where the contract or franchise is granted for as long as a decade or is renewable without rebidding.

93. In any event, competitively bid contracts or franchises are *not* examples of governmental regulation; rather, they constitute market participation, in which the government acts as a purchaser of service on behalf of the citizens. With competitive bidding for contracts or franchises, all prospective providers have the opportunity to bid on the basis of price and whatever other standards are made a part of the bid specifications.

94. In Kentucky, BFI bids for every municipal or county franchise and contract that becomes available; BFI is undeterred by the prospect of losing such a bid, as equipment does not have to be obtained until after the work has been awarded, and equipment can always be deployed elsewhere in the conduct of business.

### *Conclusions of Law*

A. West Virginia Code § 24A–2–5 regulates evenhandedly, but does not support or achieve legitimate local public interests. *Yamaha*, 401 F.3d at 568.

B. West Virginia Code § 24A–2–5 does not effectively accomplish any of the purported goals, including universal trash service at reasonable rates or any other secondary goals related to the environment and consumer protection.

C. The burdens imposed on interstate commerce by virtue of West Virginia Code § 24A–2–5's certification requirement are significant, as it is virtually impossible for a new entrant to obtain a

certificate by *de novo* application or by challenging an existing certificant for failing to provide reasonably adequate service.

D. These burdens are clearly excessive in relation to any benefit achieved by virtue of West Virginia Code 24A–2–5's certification requirement.

E. The stated goals which the PSC professes to achieve by virtue of West Virginia Code § 24A–2–5's certification requirement could be achieved by alternative means that would have a lesser impact on interstate activities.

F. In accordance with *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the court concludes and declares that West Virginia Code § 24A–2–5 violates Plaintiffs' rights under the Commerce Clause of the Constitution of the United States.

G. By Judgment Order entered this day, the PSC, its Commissioners, and all other officers, agents, employees and attorneys are permanently enjoined from enforcement of West Virginia Code § 24A–2–5, and the PSC orders of October 21, 2002, and May 30, 2003, as to Plaintiffs.

■ H. Pursuant to 42 U.S.C. § 1983, Plaintiffs have shown that they were deprived of "rights, privileges, or immunities secured by the Constitution or laws of the United States" when the PSC ordered that plaintiff Harper, doing business as SOD, must cease and desist from collecting solid waste in West Virginia until he obtains a certificate of convenience and necessity required by West Virginia Code § 24A–2–5. *Parratt v. Taylor,* 451 U.S. 527, 535–36, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part not relevant here by Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The PSC's actions in this regard were committed while "acting under color of state law."

*Id.* There clearly is a causal connection between the PSC's actions and deprivation of Plaintiffs' federally protected rights. *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978).

■ I. Because Plaintiffs have established that the PSC, while acting under color of State law, deprived them of a right secured by the Constitution, they are entitled to relief under 42 U.S.C. § 1983 and for attorney's fees and costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 1988.

The Clerk is requested to mail a copy of these Findings of Fact and Conclusions of Law to all counsel of record and to post it at *http://www.wvsd.uscourts.gov.*

### *JUDGMENT ORDER*

For the reasons stated in the Findings of Fact and Conclusions of Law entered this day, it is hereby **ORDERED, ADJUDGED and DECREED** that Plaintiffs' Complaint for a permanent injunction and declaratory relief be, and the same hereby is, granted. It is declared that West Virginia Code § 24A–2–5 is invalid insofar as it requires solid waste haulers engaged in the interstate transportation of solid waste to obtain a certificate of convenience and necessity from the PSC prior to providing those services. The PSC is therefore permanently enjoined from interfering with Plaintiffs' interstate transportation of solid waste from West Virginia to other states without having first obtained a certificate of convenience and necessity from the PSC. It is further **ORDERED, ADJUDGED AND DECREED** that:

1. In accordance with *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the court concludes and declares that West Virginia Code § 24A–2–5 violates Plaintiffs' rights

under the Commerce Clause of the Constitution of the United States.

2. The PSC, its Commissioners, and all other officers, agents, employees and attorneys are permanently enjoined from enforcement of West Virginia Code § 24A–2–5, and the PSC orders of October 21, 2002, and May 30, 2003, as to Plaintiffs.

3. Because Plaintiffs established that the PSC, while acting under color of State law, deprived them of a right secured by the Constitution, they are entitled to relief under 42 U.S.C. § 1983 and for attorney's fees and costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 1988.

4. On or before May 1, 2006, Plaintiffs may file a motion for attorney's fees and costs; the PSC may respond on or before May 15, 2006; Plaintiffs may reply on or before May 30, 2006.

The Clerk is requested to mail a copy of this Judgment Order to all counsel of record and to post it at *http://www.wvsd.uscourts.gov.*